UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UTICA MUTUAL INSURANCE COMPANY,                    \*

                              Plaintiff,           \*

                    -v-    15-cv-270                \*

R&Q REINSURANCE COMPANY,                            \*

                              Defendant.            \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


                  TRANSCRIPT OF TELECONFERENCE
              BEFORE THE HONORABLE ANDREW T. BAXTER
                          May 1, 2017
                445 Broadway, Albany, New York


FOR THE PLAINTIFF (via teleconference):

                  SIMPSON, THACHER & BARTLETT, LLP.
                  425 Lexington Avenue
                  New York, New York    10017
                        By:  Christopher G. Lee, Esq.
                             Elisa Alcabes, Esq.

FOR THE DEFENDANT (via teleconference):

                  CHADBOURNE & PARK, LLP.
                  1301 Avenue of the Americas
                  New York, New York    10019
                        By:  John F. Finnegan, Esq.
                             Allison G. Gold, Esq.

1           THE COURT:  Good afternoon.  This is Judge

2   Baxter.  This is Utica Mutual Insurance Company versus

3   R&Q Reinsurance, 6:15-cv-270.  Could we please have

4   appearances for the plaintiff, please.

5           MR. LEE:  This is Chris Lee from Simpson,

6   Thacher & Bartlett on behalf of Utica.

7           MS. ALCABES:  And Elisa Alcabes on behalf of

8   Utica for Thacher.

9           THE COURT:  All right.  For the defendant?

10          MR. FINNEGAN:  John Finnegan and Allison Gold

11  from Chadbourne and Parke.

12          THE COURT:  Okay.  R&Q has filed a motion to

13  compel further responses to its set of 256 requests for

14  admissions and the disclosure of documents relating to

15  recent and ongoing settlement discussions between Utica

16  Mutual and Burnham regarding coverage issues; that

17  motion is docket number 109.  Utica has opposed the

18  motion to compel at docket numbers 116 and 117.

19          We do have a court reporter today but she is

20  appearing by phone from Albany, so please try and

21  identify yourselves when speaking, at least the first

22  couple of times, and try to avoid talking over each

23  other and I have given Lisa Tennyson, our court

24  reporter, leave to interrupt as necessary to make sure

25  she gets a good transcript.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1           Before delving into the disputed requests for
2    admissions, I'm going to address, first, the other
3    issues raised in R&Q's motion to compel.  In particular,
4    the request for documents relating to two subjects,
5    first, Utica and Burnham's ongoing discussions of
6    coverage issues and a potential settlement thereof and,
7    secondly, Utica and Resolutes internal evaluation of
8    coverages coverage issues and the terms of a possible
9    settlement.  Those two topics are set forth in R&Q's
10   brief at page 3, docket 109-18.
11           In response to this Court's guidance at the
12   February 14th discovery Utica agreed, and I'm quoting
13   now, "Agreed to produce documents sought by R&Q that the
14   Court suggested were fair game.  I emailed
15   communications between Utica and Burnham that post-date
16   the complaint and relate to coverage issues and any
17   potential settlement," closed quote.  That's from
18   Utica's brief, page 2, docket 116.
19           Utica contends, however, that R&Q's document
20   request overreaches and demanding production of internal
21   Utica Resolute documents generated after this lawsuit
22   was filed, that's the position set forth in Utica's
23   letter brief at page 2, 11 to 13.
24           Keeping in mind that I have read your papers,
25   I will hear from each side briefly any new developments

                  Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    or supplemental arguments starting with R&Q.

2              MR. FINNEGAN:  Thank you, your Honor.  I'd

3    like to begin by -- by --

4              THE COURT:  This is -- this is Mr. Finnegan?

5              MR. FINNEGAN:  I apologize.  I should have

6    identified myself for the court reporter.  I guess I'm

7    not listening as well I should have.

8              I'd like to first begin by addressing some of

9    the comments made by Utica in its opposition papers.

10   For example, at page 11 Utica contends that it's fully

11   satisfied R&Q's requests for additional documents.

12   Obviously that's -- that statement can't possibly be

13   true, otherwise, we wouldn't be here.

14             I also found it somewhat puzzling.  In its

15   papers Utica attached a March 8th, 2007, email from

16   Mr. Lee to us without attaching the subsequent emails

17   that were appended by R&Q as part of its papers as

18   Exhibit 13 and I've -- you know, they go on and they

19   criticize.  As I understand it, a lot of these are

20   extraneous comments and doesn't get to the crux of it

21   but since there was so many of them littered in the

22   papers, I thought it was important, particularly given

23   the brevity of their papers, to point out that -- that

24   many of the statements they made are just flatly absurd.

25             They attack us and criticize us for stating,

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    in substance, that remained a dispute and they say that

2    we didn't tell the Court that the dispute had been

3    narrowed.  In point of fact, if you look at page 24 of

4    our brief, we began by saying that the dispute had been

5    narrowed and only two requests remained in controversy.

6              Now, turning to the crux of the controversy,

7    as the Court's probably already figured out, the parties

8    radically disagree about what guidance you gave us at

9    the February 14th conference and, if I can, I'd like to

10   begin by reading a passage from page 87 of the February

11   14th conference where you said, in part, in terms of

12   updating the last two years of discovery, I think you've

13   got an obligation to do that anyway and then, talking to

14   Utica, saying to the extent that there's been

15   supplemented developments, you can't now start parsing

16   which documents you're going to give us and not.

17             The next sentence is where the parties

18   diverge.  You go on to say, if you're saying the

19   post-litigation work product, you know, most of what

20   you're going to do after the complaint is filed, is

21   going to be communicated with the client, and I

22   emphasize those words, with the client, that work

23   products are privileged.

24             We're not seeking any of Utica's

25   communications with Simpson, Thacher.  We're not seeking

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1   any of Resolute's communications with Simpson, Thacher.

2          What we're seeking are the documents wherein

3   Resolute and Utica, between and amongst themselves or

4   individually, considered what terms are we going to

5   suggest to Burnham for resolving this.  Why -- how did

6   we decide, for example, that we would bill them in

7   February 2016 for $20 million?  Why did we decide to

8   contain -- put certain terms into a term sheet?

9          And based on the limited documents I have

10  where they have shown me what they have sent to Burnham,

11  I know for a fact that they revised the initial terms

12  sheet because it makes reference to a paragraph 7 and

13  the only way you can understand the -- the context of

14  paragraph 7 is to realize that it's -- they took

15  something out because what -- what's meant in paragraph

16  7, the subject matter actually is now in paragraph 6.

17         So there's a lot of -- of stuff that we would

18  want to obtain and what I think is most interesting, you

19  don't find anywhere in their opposition papers that

20  they're suggesting that any of the materials are indeed

21  work product, they seize on your words, where you put

22  forth a conditional statement and say, all right, well,

23  now we don't have to produce anything.  But Your Honor

24  never said you don't have to produce internal

25  communications.  You only said you may not have to

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    produce that which is privileged and there's a vast

2    difference and going to that point generally, unless I

3    get an order directing them to produce materials, then

4    I'm not even entitled to know what it is that they're

5    withholding from me on the basis of privilege, so I

6    think, at a bear minimum, the Court would need to order

7    them to produce all internal communications, and insofar

8    as they believe that one or more of them is subject

9    either to privilege or work --

10             THE COURT:  Mr. Finnegan?  He's probably

11   talking with his hands.  Hit the wrong button.  We will

12   give him a minute to reconnect.

13             (Pause in proceeding, 1:10 P.M.)

14             THE COURT:  Okay.  Mr. Finnegan, you had the

15   floor.  I'm not sure you know where you got cutoff but

16   you probably were arguing for ten minutes after --

17             MR. FINNEGAN:  That may well be.  Can I impose

18   upon Ms. Tennyson to give me a sense of what the last

19   words that she was able to get from me.

20             (Record read by court reporter)

21             MR. FINNEGAN:  Okay.  If they were subject to

22   privilege or work product, they would then need to put

23   them on a log, the parties obviously would have the

24   opportunity then to discuss whether or not any of those

25   assertions were subject to challenge, and then if we

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    couldn't work it out between ourselves, we would bring

2    it to the Court.  Since I just got some interference, is

3    everybody still there before I -- because the --

4              THE COURT:  I am.

5              MR. FINNEGAN:  Okay.  And I think what I --

6    and you'll have to forgive me because I -- I take notes

7    but then I don't follow my notes.  I just go off on --

8    on a rip and I'm not sure if I said it before or not,

9    but if you read their papers, they don't actually assert

10   in their papers that any of these documents are

11   privileged nor do they assert that they fall under the

12   work product, and I don't believe that they did so

13   because it would be patently unreasonable to assert that

14   every internal communication was somehow related to --

15   the vast majority of their internal communications are

16   going to relate to how to deal with Burnham and what

17   terms to put into the potential settlement with Burnham.

18   All of those would not be subject to privilege.

19              And in the May 14th conference, this Court

20   began -- and I believe it's at page 9 -- by asking Utica

21   whether or not it was taking the position that coverage

22   counsel and coverage advice was privileged and they said

23   no, no, no, they've never taken that position.  We

24   always produced those documents and they were right to

25   do so because the only thing that they were asserting

1    privilege on would be communications related very

2    specifically to reinsurance and it would also be

3    facially ridiculous to take the position that every

4    document created after the filing of the lawsuit somehow

5    is infused with work product.  It can't possibly be that

6    since Simpson, Thacher was involved in every single

7    communication and any of it -- we're not asking for

8    those.

9              THE COURT:  Let me interject here for just a

10   minute.  You're talking about work product.  Work

11   product does not require necessarily the involvement of

12   counsel.  Right?  I mean, you're -- you're talking in

13   most of these cases, and I -- it's gotten to where I

14   have done so many of these discovery conferences and so

15   many different Utica cases that I'm not necessarily --

16   have perfect recollection of prior rulings or prior

17   discussions, but in most of these cases, it seems to me

18   the parties understand that their post-filing internal

19   communications are likely to be substantially different

20   and affected by the ongoing litigation, and so this

21   typically has not required each other or each side to

22   log their post-complaint internal discussions, even

23   though they may relate to the lawsuit and, you know, I

24   get that the, you know, the privilege with respect to

25   coverage below the level of reinsurance has generally

1   been waived by Utica in this and other litigation but it

2   seems fairly clear to me that, you know, their

3   negotiations with Burnham are largely most evaluated by

4   the attempt to improve their position with respect to

5   their reinsurers and so that there's -- there seems to

6   be a very high probability that a lot of those

7   communications, if not most of them, are going to be

8   protected by work product.

9            MR. FINNEGAN:  Then, candidly, I think I would

10  like that privilege log so I can put it before the jury

11  and tell them that ever since they commenced this

12  lawsuit, they have been working actively to try to hoist

13  liability onto my client.  But, you know, your Honor, I

14  can demonstrate the fallacy in your thinking on this

15  very easily.

16           On December 24th, 2013, Utica commenced

17  another lawsuit against reinsureds.  This time against

18  Munich Re and Trans-Atlantic.  That lawsuit proceeded

19  to -- the claim against R&Q by 14 or 15 months.  They

20  did not take the position that when producing documents

21  to us, that any of the documents created after filing

22  their claim against Munich and Trans-Atlantic on Burnham

23  that everything thereafter was work product.  No.  They

24  produced the log, documents from 2014 and early 2015

25  that dealt with internal Resolute communication, that

1   dealt with communications between Resolute and -- and

2   Utica.

3          So, that alone establishes that they all know

4   full well that not everything that gets created after

5   the filing of the complaint, whether it's against R&Q or

6   against some other party is -- is privileged or work

7   product and I would agree with Your Honor that the

8   parties have taken a very sensible position that

9   communications that relate to the lawsuit are certainly

10  privileged but here there's two separate tracks.

11  They're pursuing reinsurers on the one hand and on a

12  separate hand, they're trying to resolve a coverage

13  issue with Burnham.  I certainly need to know what it is

14  and what's driving their thought processes with respect

15  to resolving issues with Burnham and if they want to put

16  on the log that every single document relates to --

17  somehow relates to reinsureds, that's great for me

18  because I think that would just prove my point is that

19  what they're doing isn't acting reasonably and in good

20  faith.

21         What they're trying, then, to do is to shift

22  the liabilities onto the reinsurers and I would point

23  out, you know, the few documents that we have gotten in

24  this supplemental production that I have had a chance to

25  get through -- and bear in mind, we had 130,000 pages so

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    I'm just -- you know, scratching the tip of the iceberg

2    but there's a February letter from the folks at Resolute

3    to Burnham and they say, oh, by the way, you owe us $20

4    million, and what I like to know, how did they calculate

5    that $20 million?  As far as I know, nobody was tracking

6    all these shares.  So there has to be some sort of

7    internal communication that deal with what we're going

8    to -- what component we are going to try to recover from

9    Burnham and that's the type of information that's only

10   available internally and then I can't get a complete

11   picture without seeing that.

12            Another thing, as I mentioned earlier, I can

13   demonstrate, based on the existence of the documents I

14   have, that there was an internal term sheet modified

15   before they shared it with Burnham.  Again, I'd like to

16   know why it is that they modified it and, again, there

17   must be something internal and if there's any -- if

18   there's any internal documents that I still need to see,

19   in November 2016 Brooklyn -- somebody at Resolute wrote

20   to John Roda, the general counsel at Burnham and said, I

21   got your call and followed up with Dan.  I believe she's

22   referring to Dan Caswell, who is a coverage person

23   then -- the Resolute organization.  He is still putting

24   final touches on his draft and I believe she's referring

25   to the draft settlement agreement, negotiating at that

point and seeking approval. They should be able to turn out in a couple of weeks. Well, if folks within Resolute were deciding what should we provide to Burnham, I certainly need to see that. How am I going to be able to evaluate the Bonafetti (phonetic) and the reasonableness of their settlement discussion if I don't know what their motivations were and that's the exact type of -- of discovery that a District Court in Connecticut in Excalibur said is very appropriate, and just because this case dealt with work product and that was mentioned, I want to --

THE COURT: You're breaking up there. So --

MR. FINNEGAN: I went back and I reread Hickman and one of the things the Court said there was that the purpose of discovery is to provide parties with access, quote, to the fullest possible knowledge of the issues and facts prior to trial. Now, unless I get insight and I get access to the internal communications, I'm left with a very stilted and jaundiced picture and, as I said from the outset, it can't be possible that every single one of them is subject to either attorney-client or attorney work product privilege.

And I understand that the word attorney, I'm usually not using work product but as the Court will recall, there were multiple types of work product.

1   There's attorney work product which forms the impression

2   and there's also work product that goes to the

3   underlying facts and here I'm trying to establish the

4   underlying facts.  Who said what?  Whom?  Why did

5   Resolute decide to use -- put these terms out to market?

6   What were their fallback positions?  And to the extent

7   that there's any improper motivation, I'm entitled to

8   find that out.

9           THE COURT:  Mr. Finnegan, this -- the

10  supplemental production that you have gotten includes,

11  supposedly, the communications between Burnham and Utica

12  in connection with this renegotiation or between

13  Resolutes and Burnham?

14          MR. FINNEGAN:  Right.  As of the point in

15  time, correct, because I believe those negotiations are

16  ongoing.

17          THE COURT:  And you really haven't had a

18  chance to digest all of those?

19          MR. FINNEGAN:  We're in the process of going

20  through it.  I mean, we -- we got it a week ago and, I

21  mean, we're good but we're not -- you know, to figure

22  out what the -- the salient provisions of 130,000 pages

23  are in a week is -- is tough, even for us.

24          THE COURT:  Okay.  All right.  Is there

25  anything else you want to say?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1          MR. FINNEGAN:  I think I've had the

2    opportunity to say my peace.

3          THE COURT:  Okay.  Mr. Lee or whoever is

4    speaking for Utica.

5          MR. LEE:  Yes.  This is Chris Lee from

6    Simpson.

7          Mr. Finnegan mentioned a few different things;

8    I'll try to address some of them.  Just to back up a

9    little, as best we can tell, the only document issue

10   really in dispute is the single category of documents

11   and that's -- the documents that R&Q describes as

12   documents about the internal evaluation of coverage

13   issues.  Now, as you and Mr. Finnegan have pointed out,

14   we have already made a very sizable production, just

15   this past week, that includes many thousands of

16   documents and that includes every document and email

17   that went out the door from Utica or Resolute to

18   Burnham, or vice versa.  If we came across that

19   document, we -- we agreed to produce it.

20          So that means we produced all the

21   back-and-forth email exchanges between Utica and Burnham

22   about the various coverage issues.  It also means that

23   we have produced all the draft term sheets and

24   settlement agreements that have been exchanged between

25   Utica and Burnham over the past year or so at a last

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1  track, we have seen from December and R&Q now has that

2  in their production.

3        So, when it comes to dispute, the documents

4  about internal coverage analysis, we think that request

5  should be denied for a couple of reasons.  First, as I

6  mentioned, we produced every single communication we're

7  aware of between Utica and Burnham about coverage

8  issues.  So those -- so those documents include several

9  iterations of settlement agreements and term sheets

10  between Utica and Burnham.  Now, if Utica conducted any

11  what R&Q describes as internal evaluations, the end

12  result of that analysis is going to be captured in what

13  was sent out the door to Burnham and we have already

14  produced that universe of documents.  So Mr. Finnegan

15  describes he wants to know what terms Resolute or Utica

16  are going to subject to Burnham.  Well, those are

17  captured in the term sheets and settlement agreements

18  that went out the door.

19        He talks about trying to figure out what

20  Utica's trying to recover from Burnham, if anything.

21  Well, that's going to be captured in what went out the

22  door to Burnham.

23        THE COURT:  Mr. Lee, let me interject.  You

24  know, that's certainly true to some extent but to the

25  extent that Utica's being guided in its -- in its

1    negotiations with Burnham about the reinsurance

2    implication, I think Mr. Finnegan is arguing that he's

3    entitled to have an understanding of some of the

4    motivation behind the negotiations that are taking place

5    which might not be reflected in your communications with

6    Burnham.

7             MR. LEE:  To that point, your Honor, Mr.

8    Finnegan mentioned Mr. Caswell and he is a coverage

9    person, from what we understand, the coverage point

10   person, the Burnham account from Resolute.  R&Q is going

11   to get a chance to depose Mr. Caswell in just a few

12   weeks once we get through those documents and so, to the

13   extent that they want to delve into motivation and what

14   have you, they're going to have a chance to depose him

15   about those motivations and they can reference the many

16   documents that we have produced about a potential

17   settlement between Utica and Burnham.

18            THE COURT:  All right.  Well, tell me -- let's

19   talk a little bit about the extent -- I mean, I used the

20   last time we met about the possibility work product

21   privilege issues.  I mean, I -- do you expect that you

22   would be claiming work product or attorney-client

23   privilege with respect to some -- any, all, most of the

24   internal documents that are related to the negotiations

25   with Burnham?

1        MR. LEE:  Yeah.  The short answer is yes.
2   These documents are clearly from March 2015 and forward
3   and that's when this complaint was filed.  So any
4   documents, any internal documents about coverage issues,
5   that's necessarily going to impact the reinsurance
6   litigation that we're in.
7        THE COURT:  Okay.  All right.
8        MR. FINNEGAN:  May I have an opportunity to
9   respond?
10       THE COURT:  Let me just see if Mr. Lee is
11  finished because I interrupted.
12       MR. LEE:  I am, and I'm still on the line.
13       THE COURT:  Okay.  Mr. Finnegan?
14       MR. FINNEGAN:  A couple of things.  The mere
15  fact that it may impact the litigation is not the test.
16  The test is whether or not the documents were created
17  for the purpose of a litigation.  Here, the documents
18  we're asking to see were created for the purpose,
19  allegedly, of resolving a coverage controversy with
20  Burnham.  If that was their principal purpose for the
21  creation of them, they can't possibly be subject to
22  anything to withhold from R&Q and you know and I -- and
23  I say this guardedly because I don't like throwing
24  stones at people.  But you know that their invocation of
25  privilege is protect fraud because Mr. Lee just told you

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1   that during depositions, he will allow me to delve into

2   the motivations of Mr. Caswell and others.

3          Well, if I'm allowed to delve into their

4   motivation in depositions, to be able to do that

5   effectively, I need the documents.  But the mere fact

6   that I'm allowed to do it in depositions tells you that

7   there's not a genuine privilege that would shield their

8   underlying documents and -- and to -- you know, he began

9   his entire spiel by saying, well, the end result is

10  captured in -- in the -- in the documents.  Well, if I

11  told you that the end result of the Rangers game was

12  three to two, you would know what the end was but you

13  would have no idea whether it was a good game, whether

14  it was a tight game.  You would have no idea whether --

15  you have no idea about the day-to-day or the

16  minute-to-minute happenings in that game and that's

17  what's important.

18         When you go to analyze something, it's not

19  what the final score is, you know whether it goes under

20  the win or loss column but when you try to assess

21  whether something is a good game or not, you need to

22  know all of the track record.

23         THE COURT:  Well, Mr. Finnegan, again,

24  I'm having a little trouble with your analysis about

25  work product and I was a criminal litigator for most of

1    my life, so I don't always have all this nuances of this

2    but somebody testifying, how much does the work product

3    privilege come up with respect to what's in their mind

4    as opposed to whether a document was influenced by the

5    ongoing litigation?

6           It seems to me to say that they're going to

7    allow him to testify about certain things independent of

8    documentation in the case that a claim of work product

9    privilege with respect to certain documents would

10   necessarily be privileged.

11          MR. FINNEGAN:  Well, I go back to my initial

12   premise, which is, there's two facts here.  There's a

13   reinsurance litigation and certain materials prepared in

14   anticipation or -- or used in that litigation would

15   arguably be subject to privilege or subject to work

16   product.  But where materials are being prepared in

17   connection with the underlying litigation before the

18   underlying coverage dispute between Burnham and Utica,

19   it can't possibly, they have already raised that

20   privilege and -- and I'm -- I'm stymied to try to come

21   up with another way to express myself but I'll go back

22   to what I said earlier.

23          They commenced the earlier litigation against

24   Munich Re and against Trans-Atlantic.  Nobody's took the

25   position that every document created thereafter was work

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    product.  They allowed me to see documents created from

2    2014.  Would they be entitled now to say to Munich Re,

3    having produced documents to me from 2014, oh,

4    everything created after December 23rd -- December 24th,

5    2013, when we sued you, is work product.  They are

6    putting an artificial importance on when they commenced

7    the litigation.

8         What if they commence the litigation, for

9    example, against All-State next week?  Is everything

10   prior to now fair game for All-State to get into

11   discovery because of a lawsuit wasn't against them?

12        THE COURT:  Hang on -- hang on just a second.

13   We heard another beep.  So let's make sure we haven't

14   lost anybody.  Mr. Lee, are you still online?

15        MR. LEE:  I still am, your Honor.

16        THE COURT:  All right.

17        MR. FINNEGAN:  And candidly, the rule that the

18   Court is contemplating gives way too much ability to put

19   cutoff discovery.  What it means is, let us go far

20   enough down the road with negotiations with our

21   underlying insured and then we will start a lawsuit and

22   then we don't have to produce anything more.  I mean,

23   I -- that can't possibly be the rule.

24        THE COURT:  Okay.  But here's the problem

25   because, I mean, I've done privilege reviews in others

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    of these cases, right?  And so there would be -- there

2    would be documents discussing coverage issues between

3    Utica and their insurers under either the primary

4    policies or the umbrella policies and then there might

5    be some -- some remark in these internal documents about

6    how this might impact their reinsurance recoveries and

7    Utica invoked the privilege and that's the stuff that

8    the other side wants the most because it reflects the

9    way that their negotiations with the insured -- the

10   underlying insured is influenced by their desires to

11   increase their reinsurance recovery but that's -- that's

12   the line they have drawn in terms of what they have

13   waived and what they haven't waived.

14        MR. FINNEGAN:  I get that and that's precisely

15   why I'm saying I believe in the appropriate response

16   here is to order them to produce the internal

17   communications.  Insofar as one or more of them are

18   subject to privilege, they can either redact the line

19   that you just mentioned, for example, how it might

20   impact reinsurance and give me access to the remainder

21   of the documents.  I don't think it's as herculean task

22   as they're suggesting it is.

23        We have gone through document production in

24   this cases and in Goulds and Your Honor is right.  There

25   have been privilege rights, I don't think any of those

1   privilege fights have been from us.  I think what we

2   have done is we have discussed invocations of privilege

3   with our adversaries and we have come to agreement.

4   Certainly I know for fact that we put things in our log

5   that when they were challenged, we gave and -- and I

6   believe that's in the case with Utica as well.

7          The mere fact that there have been instances

8   in the past where parties have come to this Court and

9   asked for relief doesn't say that they're not entitled

10  to get underlying documents to begin with and that's --

11  that's the antiquated question.  They won't even give me

12  a privilege log and, candidly, if this Court doesn't

13  first direct them to produce the internal evaluation --

14         THE COURT:  Well, I get that.  I haven't -- I

15  haven't seen a privilege log yet that hasn't enlightened

16  anybody, including me, but the bigger point is, you

17  know, what we're saying, essentially, is that to the

18  extent there are documents reflecting how Resolute's

19  ongoing negotiations with Burnham are really directed at

20  trying to maximize their reinsurance recoveries, you're

21  not going to get that because it's work product

22  privilege.

23         To the extent their negotiations with Burnham

24  have nothing to do with the reinsurance, you're going to

25  get them but they're not going to be used.  So why do we

1    go through this entire exercise and put me through yet

2    another round of privilege -- privilege litigation if --

3    if where the line is drawn is -- happens to coincide

4    with what's going to be useful or -- and interesting to

5    you and what isn't?

6              MR. FINNEGAN:  I think you just said that the

7    documents won't be useful or interesting to me.  I don't

8    know that until I see them.  I don't know until I find

9    out what miss -- for example, Brooke Green and Dan

10   Caswell discussed relative to what their negotiating

11   positions would be with Burnham.  I don't know whether

12   it's going to be useful.  I can tell you, having seen a

13   lot of these internal Utica documents, that there are a

14   number of documents that are useful and interesting to

15   me and that will certainly feature prominently in any

16   motion practice or in any trial of this case.

17             And, you know, you're putting me to an

18   impossible burden of telling you what's the substance of

19   these documents without first having seen them and I

20   can't do that.  But obviously if -- if I can establish

21   right now, for example, that they took a paragraph out

22   of a draft term sheet before they disclosed to Burnham,

23   it would be interesting to me to find out what it is

24   that they took out and, more importantly, why it is that

25   they thought it was important to take it out.

                 Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

1          THE COURT:  But if they thought it was

2     important because of the reinsurance implication, then

3     it seems to me it's going to be privileged.  If they

4     didn't --

5          MR. FINNEGAN:  Then I won't get it.  So --

6          THE COURT:  So, Mr. Lee, why can't you -- why

7     can't you go through these documents and do a privilege

8     log like you would do on pre-complaint documents?

9          MR. LEE:  Well, thank you, your Honor.  You

10    know, we obviously disagree with some of the -- or many

11    of the points that Mr. Finnegan raises.  You know, I

12    guess it's just -- as Your Honor -- as Your Honor we

13    think is suggesting, it's very unconventional and in a

14    post-litigation context to require parties to log

15    communications that obviously touch on the issues that

16    are at the heart of the dispute and so, you know, I

17    think we could get -- I think Mr. Finnegan is suggesting

18    that these bodies of water are very distinct but I think

19    in the end, the issues that are -- that are -- invoke

20    the privilege are inextricably or intertwined with and

21    embedded with all of the documents.

22          So I think we just think given these

23    circumstances in the post-litigation context, it doesn't

24    make sense.

25          THE COURT:  Okay.  I'm going to start with a

1    little discussion of the work product privilege I think

2    is really the key issue here because, as Mr. Finnegan

3    has pointed out, he's recognizing that communications

4    involving counsel would -- are not the focus of what

5    he's looking for.

6             In order for a party to assert privilege under

7    the attorney work product doctrine, they must be able to

8    show that the documents were prepared in anticipation of

9    litigation by a party or its representative not in the

10   ordinary course of business.  Carpenter v Churchville

11   Green Homeowners Association is a Western District of

12   New York case from September 29, 2011, that makes its

13   point, it's recorded at 2011 Westlaw 4711961 at page 8.

14            Also relevant to that point is Rule 26(b)(3)

15   of the Federal Rules of Civil Procedure in U.S. v

16   Construction Product Research, Inc., 73 F.3d 464 and

17   473, Second Circuit from 1996.  A document created for

18   both a business purpose and litigation may be protected

19   under the work product doctrine even if the litigation

20   is not the primary purpose, and I'm quoting now, as long

21   as the document would not have been prepared in

22   substantially similar form if not for the prospect of

23   litigation.  That's a quote from in re Veeco

24   Instruments, Inc., securities litigation, Southern

25   District of New York case from March 9th, 2007, reported

1    at 2007 Westlaw 724555 at page 5, in turn cites the

2    Second Circuit case of <u>United States versus Adlman</u>, 134

3    F.3d 1194 to 1195, in 1998 Second Circuit case.

4            As I recognize, during the February 14th

5    discovery conference, docket number 108 at page 87, any

6    post-complaint internal communication about Utica's

7    negotiations with Burnham would, in all likelihood, be

8    protected at least by the work product privilege to the

9    extent it was relevant to the reinsurance implication of

10   those negotiations.

11           As I suggesting earlier, it's difficult to

12   concede that Utica or Resolute would generate internal

13   documents about negotiations with Burnham after this

14   action was filed that would not, in a significant way,

15   be affected by the pendency of this reinsurance

16   litigation.

17           To the best of my recollection, the parties in

18   the various Utica Mutual cases I have handled over the

19   years have not sought, nor have I required, a Utica log

20   or produce post-complaint internal documents relating to

21   coverage matters that would clearly impact the

22   reinsurance issues that were being litigated.

23           I recognize that the situation in the Century

24   case where I denied any discovery with respect to

25   post-complaint negotiations between Utica and <u>Goulds</u>

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1   <u>Pump</u> is very different than this case because

2   Utica-Burnham settlement would likely have a substantial

3   impact on R&Q's potential future obligations to Utica.

4   That is why I advised the parties in February that I

5   thought discovery regarding even post-complaint

6   communications between Utica and Burnham regarding the

7   settlement discussions would be fair game for discovery.

8   But the impact of a potential settlement on R&Q's

9   exposure in this case doesn't change the privilege issue

10  with respect to post-complaint internal Utica-Resolute

11  documents regarding settlement negotiations or related

12  coverage issues.

13          Given the likelihood that any material and

14  relevant post-complaint documents requested by R&Q would

15  be protected by the work product privilege, it is not,

16  in my view, proportional to the needs of the case at

17  this stage of the proceedings to require Utica to

18  generate a privilege log for those documents, and for me

19  to get enmeshed in more discovery in privilege

20  litigation.

21          As I stated earlier, you know, it is certainly

22  conceivable that there are aspects of negotiations

23  between Utica and Burnham that don't have a significant

24  impact on the reinsurance issues and that might not be

25  influenced by the litigation and might not be protected

1   by the work product privilege, but it seems to me that

2   those documents would essentially not be of great

3   relevance and under the principles of proportionality to

4   require Utica to go through the unusual step of logging

5   all these post-complaint documents I think would be,

6   again, not proportional to the needs of the case and

7   burdensome.

8          So I'm going to deny R&Q's motion to compel

9   further responses regarding Utica's internal

10  post-complaint documents relating to the negotiations

11  with Burnham.  Now, I am not ruling out limited

12  reconsideration of this issue, depending on what Utica

13  produces with respect to its direct communications with

14  Burnham or depending on the ultimate resolution of the

15  ongoing settlement discussions and I recognize that Mr.

16  Finnegan has drafts, only scratched the surface of the

17  voluminous documents that have been produced and we

18  don't have the benefit of, you know, his deep analysis

19  of those documents as it might impact on this.  But, for

20  now, I think it would be unduly burdensome for both

21  Utica and the Court and not proportional to require

22  further responses with respect to the internal

23  documents.

24          And the other thing that may impact my

25  thinking on this might be the depositions of some of the

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1   key players here and, you know, I think it is worth

2   exploring whether the depositions of people like this --

3   Mr. Caswell would allow some discussion of the

4   motivational issues and that sort of thing that might be

5   useful to R&Q and so, you know, after all of those, I'm

6   not ruling out reconsideration but I just think at this

7   stage, it's late -- relatively late in the pretrial

8   proceedings, given the likelihood of the frequency

9   of work product privilege applying and the lack of

10  relevance of the documents to which it would apply.  I'm

11  not going to order Utica to respond further or to log

12  all those documents.

13          Okay.  Now, turning to the applicable -- the

14  request for admissions, I'm going to start with some law

15  relating to requests for admissions.  U.S. District

16  Judge Kimba Wood provided a concise decision of the

17  general standards for evaluating the appropriateness of

18  requesting for admissions and the sufficiency of

19  responses in Rule 36 of the Federal Rules of Civil

20  Procedure in Wiwa v Royal Dutch Petroleum Company,

21  Southern District of New York case from May 26, 2009,

22  cited at 2009 Westlaw 1457142 at page 4 to 5 and I'm

23  going to read a lengthy quote here:

24          "Requests for admissions are not a discovery

25  device.  The purpose of Rule 36 is to reduce trial time

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    by facilitating proof with respect to issues that cannot

2    be eliminated from the case and narrowing the issues by

3    eliminating those that can't be.  Requests should be

4    simple and direct, not vague or ambiguous, and should

5    state the facts in such a way that it can be denied or

6    admitted with an absolute minimum with an explanation or

7    qualification.  A denial must be stated specifically and

8    must respond to the substance of the matter.  However,

9    responding party may, in good faith, qualify its answer

10   or deny only part of a matter.  Qualification of a

11   denial is appropriate if the statements in the request,

12   although containing some truth, standing alone out of

13   context of the whole truth conveys unwarranted unfair

14   references."  I swear they must mean "inferences" but

15   they use the word "references".

16            Continuing the quote:  "Qualifying a response

17   that may be particularly appropriate if the request is

18   sweeping, multi-part, involves sharply contested issues

19   or goes to the heart of a defendant's liability.  Any

20   qualifications should provide clarity and lucidity to

21   the genuineness of the issue and not obfuscate,

22   frustrate or compound the references.  However, a

23   response should be deemed sufficient if it reasonably

24   informs the requesting party what is being admitted or

25   denied.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

1           The requesting party can challenge the

2    sufficiency of its adversary's responses.  When

3    assessing the sufficiency of a party's responses, a

4    Court considers whether the response meets the substance

5    of the request and whether any qualifications are

6    demanded by and made in good faith.  If a Court finds a

7    response insufficient, the Court may order either that

8    the matter is admitted or that an amended answer be

9    served.  Deeming a matter admitted is a severe sanction.

10           "Furthermore, a motion to determine the

11   sufficiency of a response is not to be used as an

12   attempt to litigate the accuracy of a response."  That's

13   the end of the quote.

14           Former Magistrate Judge Treece articulated a

15   few other important aspects of the standards of Rule 36

16   in the cases of Henry versus Champlain Enterprises,

17   Inc., a Northern District of New York 2003, reported at

18   212 F.R.D. 73 at page 78.  Again, that's a fairly

19   lengthy quote.  "The party is permitted to object to the

20   request for a particular aspect of the request.  This

21   requires the responding party to set forth in detail the

22   reasons why the answering party cannot truthfully admit

23   or deny the matter.

24           "If the objection is only to a portion of the

25   request, the responding party is required to

1    unambiguously answer that portion of the request to

2    which the objection does not apply.  Furthermore, these

3    objections must be directed and specifically related to

4    a specific request.  General objections without any

5    reference to a specific request to admit are meritless.

6            "To the extent that the answering party is

7    incapable of providing a response with the information

8    reasonably available to it, Rule 36 requires a

9    responding party to make a reasonable inquiry, a

10   reasonable effort to secure the information that is

11   readily obtainable from persons and documents within the

12   responding parties' relative control and to state fully

13   those efforts.  Such reasonable inquiry includes an

14   investigation and inquiry of employees, agents and

15   others who conceivably, but in realistic terms, may have

16   information which may lead or furnish the necessary and

17   appropriate response.  The inquiry may require venturing

18   beyond the parties to the litigation and include, under

19   certain limited circumstances, non-parties but certainly

20   not strangers."  That's the end of the quote and with

21   both of these long quotes, I have deleted a lot of

22   citation and made no effort to get into internal

23   quotations.

24           A few other points regarding the legal

25   standards for request for admissions.  The standards for

1    relevance for request for admissions are as broad as the

2    standards for federal discovery generally.  That's

3    established by, among other cases, Booth Oil Site

4    Administrative Group versus Safety-Kleen Corporation,

5    Western District of New York case from 2000, 194 F.R.D.

6    76 and 79, which held, and I'm quoting, "A request to

7    admit coverage of the full range of information

8    discoverable under Federal Rule of Civil Procedure

9    26(b), including matters of facts as well as the

10   application of the law to the facts."

11          Secondly, another principle related to Rule

12   26, and I'm quoting from another case:  "It is well

13   established that possession of information by the

14   requesting party is irrelevant to the propriety of

15   request to admit that purpose of which is not to

16   discover information but to narrow issues for trial."

17   That's Al-Jundi versus Rockefeller, Western District of

18   New York case from 1981, cited at 91 F.R.D. 590 at 594.

19          Now, I'm going to start by addressing a few

20   general issues relating to the proportionality of R&Q's

21   request and the accuracy of Utica's responses and then I

22   will dive into the thicket of individual requests.

23          I'll start by noting that R&Q's brief

24   specifically discussed all but about a hundred of its

25   256 requests for admission.  In footnote 2 of the brief,

1    R&Q then states that it will also have specifically

2    addressed the other 100 or so requests were it not for

3    the 25-page limit imposed by the Court onto the

4    memorandum of law supporting the motion.

5            R&Q then asked that the Court direct Utica to

6    apply the Court's guidance with respect to the other

7    requests and modify its responses to those other

8    requests accordingly.  It is not unreasonable for the

9    Courts to apply page limits to non-dispositive motions,

10   even if the result is the parties are then required to

11   prioritize the issues on which they seek relief from the

12   Court.  I would note that even though I have placed much

13   more stringent page limits on discovery motions in other

14   Utica Mutual cases, with respect to this motion, I use

15   the 25-page limit established by our local rules.

16           R&Q did not request an extension of that page

17   limit, although it used every bit of 25 pages in their

18   brief.  The federal rules do not place emphasis on the

19   number of requests for admissions that a party may

20   propound.  However, even in a case as complicated as

21   this one, 256 requests for admissions seem excessive and

22   unduly burdensome.  R&Q's requests are often duplicative

23   and overlapping.  However, that's probably reflected, in

24   part, R&Q's largely correct anticipation that Utica

25   would strain to avoid making definitive admissions in a

1     variety of areas that would not seem to be open to

2     genuine dispute.

3           Based on consideration of proportionality, I

4     am only going to consider and rule on the 150 or so

5     requests for admissions that R&Q's specifically

6     addressed in its brief and will not order Utica to

7     respond to the other 100 or so that were only mentioned

8     in footnote 2.  I would note that R&Q did specifically

9     discuss in its brief generally and other footnotes a

10    handful of the numbered requests that were not discussed

11    in the text.  I will address that handful of requests

12    notwithstanding the fact that they were also listed in

13    the catchall footnote of footnote 2.

14          But to be clear, unless I make a specific

15    ruling with respect to a particular request during the

16    conference today, R&Q's motion to compel a further

17    response to other requests is denied.

18          Now, I think that R&Q correctly argues, based

19    on, inter alia, the Henry case, 212 F.R.D. 78, that

20    general objections are not appropriate in the context of

21    requests for admissions.  So I'm going to consider only

22    the skill fulsome objections and responses that Utica

23    makes specifically to each request for admission.  I

24    will ignore Utica's attempt to incorporate by reference

25    its general objections.

1           R&Q also raises a general argument that Utica

2     unreasonably objected to more than 175 terms or phrases

3     which are listed in Exhibit 6 of R&Q's papers, docket

4     number 109-8.  That is in -- the objections to these

5     phrases are terms that were vague or ambiguous.  R&Q

6     requested that I strike these objections or, in the

7     alternative, order Utica to respond based on definitions

8     found in R&Q's request or in Webster's Collegiate

9     Dictionary; that's reflected in R&Q's brief at pages 7

10    to 8.

11          It is clear that Utica's objections based on

12    vagueness and ambiguity were often evasive and arguably

13    abusive.  However, Utica typically did not rely

14    exclusively on that objection and often provided

15    qualified responses notwithstanding objections to

16    certain terms and phrases and I don't frankly think that

17    a resort to a dictionary definition is particularly

18    helpful since Webster's often has alternative

19    definitions for many words.

20          I think it is best to defer consideration of

21    whether certain words or phrases are vague or ambiguous

22    to my consideration of the particular requests because

23    generally that decision is best made in its specific

24    context.

25          I'm also going to defer to my consideration of

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    particular requests R&Q's argument that Utica improperly

2    objected to many requests by stating that the requests

3    relied on a false premise.  As Utica points out, I have

4    previously stated in Century Indemnity case, docket

5    number 6:13-cv-995 that the proponent of a request for

6    admission is not -- I'm quoting myself now -- "entitled

7    to precisely the answer it prefers".  That's from

8    the hearing transcript on September 9th, 2014, in the

9    Century Indemnity case at page 11, docket number 93,

10   again, case number 13-cv-995.  Moreover, as established

11   by the Wiwa case that I quoted earlier, I can't give

12   into an assessment of the accuracy of a response for

13   admission in evaluating its insufficiency.  However,

14   there are definitely instances where Utica has

15   improperly evaded making a fair response to certain

16   R&Q's requests using the false premise objections.  I

17   will address those specifically but not as a general

18   matter.

19           Utica has raised one particular objection

20   in connection with a number of requests that I can

21   address, in part, in general terms.  Utica suggests that

22   it should not be required to respond to a request for

23   admission that involves a disputed issue that is central

24   to the litigation.  That's Utica's brief at pages 7 to 8

25   makes that argument.

1             Cases cited by R&Q, some of which I've

2      discussed already, indicate -- I'm sorry.  Cases cited

3      by Utica, some of which I've discussed already, indicate

4      that it may be appropriate for a party to deny in good

5      faith or to provide a qualified answer to a request

6      which deals with a key disputed issue in the case.  See,

7      for example, Burns versus Bank of America, a Southern

8      District of New York case from June 4th, 2007, reported

9      at 2007 Westlaw 1589437 at page 10, which held, and I

10     quote, "Where issues in dispute that go to the heart of

11     many of plaintiffs' claims are requested to be admitted,

12     a denial is a perfectly reasonable response," closed

13     quote.  However, I agree with cases from this Circuit

14     that have held that, and I'm quoting now, "the fact that

15     an admission provided in response to a request made

16     prove decisive to the case is no grounds for a refusal

17     to respond," closed quote.  That's a quote from the

18     Booth Oil case, 194 F.R.D. at page 80.

19             So I'm now going to address the specific

20     requests for categories of requests roughly in the order

21     presented in the R&Q's brief and I am going to, time to

22     time, ask you questions and give you a chance to make

23     supplemental arguments.  I'm going to do in the context

24     of specific requests or categories requests.

25             I'm going to -- about a 30-second break and

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    get water and have a drink before I resume.  So hang on

2    just a minute.

3              (Pause in proceeding)

4              MR. LEE:  Thank you.

5              THE COURT:  Okay.

6              MR. FINNEGAN:  Would it be possible to ask for

7    a three-minute break?

8              THE COURT:  Absolutely.  We will break for

9    three.

10             MR. FINNEGAN:  Thank you.

11             (Pause in proceeding)

12             MR. LEE:  Thank you.  Your Honor, could you

13   just give us another minute?

14             THE COURT:  Yes, that's fine.  Missy is not

15   back in the room anyway.

16             MR. LEE:  Okay.  We will chime in when we're

17   all already but it should be just a minute.

18             (Pause in proceeding, 2:11 P.M.)

19             (Following recess 2:13 P.M.)

20             MR. LEE:  Your Honor, this is Chris from

21   Simpson, we are ready on our end if --

22             THE COURT:  Okay.

23             MR. FINNEGAN:  We are as well.

24             THE COURT:  Okay.  So while I have had

25   significant involvement in monitoring the discovery

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1   proceeding in this and other Utica Mutual cases, I

2   obviously do not have the level of familiarity that the

3   lawyers have with respect to complicated background of

4   this particular litigation, the common parlance and

5   terminology used in the reinsurance deal than the gory

6   details of your prolonged discovery battles.  As a

7   result, it does not make a heck of a lot of sense to me

8   that the parties would prefer that I take on the task of

9   reformulating requests for admission and responses

10  rather than having the lawyers conduct a reasonable and

11  rational negotiations to resolve those difference but I

12  guess this is the new phrase be careful what you wish

13  for because I'm going to try to resolve your major

14  disagreements.

15          In the interest of efficiency, I'm going to

16  attempt, to the extent possible, to be very specific

17  about the deficiencies in the requests for the responses

18  as opposed to providing general guidance and allowing

19  the parties to fight over another round of reformulating

20  requests to responses.  So, while I won't be able to do

21  that in every case, I'm going to try to minimize the

22  chance that we are going to be doing this again in a

23  month or so.

24          So the first group of requests relate to

25  Utica's alleged failure to disclose, and I'm quoting

1    now, complete copies of primary policies and

2    corresponding underwriting files, in particular,

3    requests number one through eight, 11 through 18, 19, 21

4    through 28 and 29.  So I'm going to start with request

5    1 through 8 which state, and I'm quoting:  "Utica has

6    been unable to locate a complete copy of the primary

7    policy that Utica issued to Burnham effective for all or

8    any part of the period and, there again, a series of

9    questions that covers a period January 1, '76, to

10    January 1, '84, or the '76 to 1983 primary policy."

11         Utica's response is:  After invoking the

12    general objections, which I'm not considering, Utica

13    admits that after conducting a reasonable search, it has

14    not been able to confirm that it has located all of

15    the pages of the primary policies that Utica issued to

16    Burnham effective for all or any part of that -- of the

17    period," closed quote.

18         Now, I find that Utica went one step too far

19    in hedging its responses by adding the clause that it

20    couldn't confirm that it had located all the pages of

21    the primary policies.  There does not seem to be any

22    genuine dispute that Utica was not able to find all the

23    pages of some or all of the policies and it must so

24    admit.  While the term "complete copy" seems relatively

25    clear notwithstanding Utica's suggestion in other

1    responses that it was vague and ambiguous, Utica's

2    alternative articulation, in terms of missing pages, is

3    adequate.  So, essentially, I'm going to direct that --

4    Utica to provide the following response:  Utica admitted

5    that, after conducting a reasonable search, it has not

6    been able to locate all pages of the primary policies

7    that Utica issued to Burnham effective for all of any

8    part of that period."  And, you know, to the extent that

9    is not true with respect to particular years, fine, but

10   that's the language I'm going to be looking for.

11         And I'm going to say this up front.  I'm also

12   going to say it at the end.  I usually try, at the end

13   of these long discovery conferences, to do a summary

14   order which summarizes the particular rulings that I

15   have made.  In this case, since I'm dealing with 150 or

16   so requests for admissions, I'm not going to do that.

17   So, I'm going to basically direct you to the transcript

18   of this proceeding for my rulings with respect to these

19   individual requests for admissions, so what that means,

20   I think, is to the extent I say something that you think

21   requires clarification or is unclear in some way, I

22   would suggest that you interject and we get it cleared

23   up on the record because I'm not going to have my usual

24   opportunity to clear things up in my summary order.

25         All right.  So, the next request in this group

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    is number 9.  R&Q seeks similar admissions with respect
2    to the Utica-Burnham primary policies for the prior
3    period January 1, 1972, and not 1970, which was stated
4    in some of the requests but R&Q's brief makes clear it
5    was a typo.  So the period from January 1, '72, to
6    January 1, '76, or '72 through '75 primary policies.
7    Utica raises a host of objections including relevance.
8    So I have -- I have some -- a couple of questions here.
9              Starting with you, Mr. Finnegan, did R&Q make
10   document demands for the primary policies from the
11   earlier period or related written related discovery
12   demand?
13             MR. FINNEGAN:  Actually Ms. Gold was going to
14   handle this but -- but since she's looking at me
15   quizzically, the answer is, I believe we made document
16   requests for it but we ended up compromising in
17   discussions and only took '76 and later, which is to say
18   that the period prior to '76 isn't relevant because, as
19   we pointed out, for a -- you know, 12- or 13-year period
20   beginning January 1st, 1972, through December 31st,
21   1983, the underlying primary policies lack aggregate
22   limits.
23             THE COURT:  Okay.  So you made those demands
24   but in negotiations, then, you agree to accept only
25   the primary policies in the years that you had

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1   reinsurance or R&Q had reinsurance?

2           MR. FINNEGAN:  That's correct.

3           THE COURT:  Fine, and is there other prior

4   discovery other than the document production that makes

5   clear that Utica was not able to find complete versions

6   of the earlier primary policies?  Depositions or

7   whatever?

8           MR. FINNEGAN:  There are certainly documents,

9   internal Utica documents including, I believe the

10   earliest of which is August 8th, 1987, created by Dane

11   Austin and one of his bosses at the time that talks

12   about it.  There are still later memoranda created by

13   claims folks and there is a chart which I believe is

14   dated August 15th of 1985 that lists, you know, all the

15   policies and indicates which ones they had information

16   pertaining to and which ones they lacked information.

17           THE COURT:  So Mr. Lee or Ms. Alcabes, whoever

18   is speaking on this issue, how is Utica burdened in

19   addressing this request given that it apparently had to

20   try to reconstruct the earlier primary policies back in

21   the -- in the '80s?

22           MS. ALCABES:  Your Honor, this is Elisa

23   Alcabes.  You know, I think the issue herein so far as

24   R&Q admitted I guess that they have withdrawn their --

25   their request for production of those earlier policies.

1   We are of the position that they're not relevant, and

2   it's just a little bit of a slippery slope, I guess, in

3   terms of why do we need policies that are not at issue

4   involved here.  We don't think that it forms the -- the

5   process in any way.  And so, you know, to -- we don't

6   understand why they need this, we don't understand how

7   it streamlines the trial which we understand to be the

8   purpose of Rule 36.  I mean, we have that kind of

9   overarching issue with a lot of these requests.  We

10  just -- they don't seem to be geared towards making any

11  anything easier to deal with at trial.

12          THE COURT:  All right.  But your main issue is

13  relevance and not burden.

14          MS. ALCABES:  Yes.

15          THE COURT:  Okay.  Well, I guess I do see the

16  relevance argument that R&Q makes here by the broad

17  standards of relevance applying to federal discovery

18  rules, the contents of the earlier Utica-Burnham

19  policies are sufficiently relevant.  The time period

20  over which these policies were found incomplete,

21  particularly with respect to explicitly stated products

22  aggregate limits is relevant to R&Q's effort to rebut

23  Utica's position that these policies were complete

24  and did include specific limits.

25          It is difficult to imagine that Utica did not

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    need to -- it is apparent from what Mr. Finnegan said,

2    actually, that Utica did try to reconstruct the '72 to

3    '75 policies in connection with Burnham's claim.  So the

4    burden of investigations to respond is not substantial.

5              So, you know, to the extent you're arguing

6    relevance here, I think the fact that there's a longer

7    period of time during which Utica is not able

8    to reconstruct the complete policies and there are some

9    key blanks that were not filled in with respect to

10   products aggregate limits is relevant under the broad

11   standards.  So, I'm going to order response to number 9

12   and, again, would note that while the phrase "complete

13   copy" does not seem vague or ambiguous in the context of

14   insurance policies, Utica can use the pages phrasing it

15   used in response to numbers 1 through 8.

16             MS. ALCABES:  We understand and I imagine that

17   was probably resolved from the other objections to that

18   other time period.

19             THE COURT:  Okay.  Now I'm going to take

20   request number 21 to 29 out of order for reasons that I

21   think will be clear in a minute.  Number -- bear with me

22   here.  Number 21 through 29 reads:  That Utica has been

23   unable to locate any portion of the underwriting files

24   other than, perhaps, than pages of policy documents,

25   copies of which have been produced in this litigation

1    for primary policy that Utica issued to Burnham

2    effective for all or any part of the period January 1,

3    '76, to January 1, 1984.

4         Utica responds:  Utica admits that it has

5    produced certain documents relating to underwriting

6    of one or more of the primary policies and that it has

7    not produced documents that it has not located, that was

8    quoted.  Number 29 makes essentially the same request

9    with respect to the '72 to '75 primary policies and

10   Utica provides essentially the same request.

11        So I guess my first question:  Is there a

12   genuine dispute as to whether Utica was able to locate

13   and produce any underwriting documents for these primary

14   policies?

15        MS. ALCABES:  My understanding is that we have

16   produced underwriting documents.  So, you know, how do

17   we answer this question?  We could deny that we are

18   unable to locate any portion of the underwriting file or

19   we could admit that we located and produced it.  This

20   doesn't seem to be a genuine -- it doesn't seem to be a

21   genuine dispute.  Either we found the underwriting file,

22   underwriting documents and we produced them or whatever

23   we couldn't find, we didn't produce.

24        I mean, there's no reason that there are

25   issues concerning the ability to locate policies and

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    underwriting -- I think, you know, from the -- the way

2    that this request is phrased, it's asking whether we are

3    unable to find any underwriting documents.  I mean, we

4    have found underwriting documents.  We produced

5    underwriting documents.  To make a representation about

6    something that we can't find, you know, how do we do

7    that?  Do we deny it and then they come back and say how

8    can you deny it?  Or do we admit that we produced

9    underwriting documents.  So we certainly would -- would

10   welcome the Court's guidance on this but we feel like we

11   have answered this question.

12          THE COURT:  Okay.  So I -- I think the

13   response, under the circumstances, should be reframed as

14   follows or something similar:  Utica admitted that it

15   has produced all of the documents related to the

16   underwriting of one or more of the primary policies that

17   it was able to locate after reasonable search.  I mean,

18   wasn't clear to me is that if you are saying you

19   produced some but perhaps not all, I think perhaps

20   that's a less -- a more clear way of saying Utica admits

21   it has produced all documents relating to the

22   underwriting or more one or more of the primary policies

23   that it was able to locate after a reasonable search.

24   Not saying you can't tinker with that but I think that's

25   perhaps phrasing that it's less evasive than what you

1    had.

2           All right.  Going back now to request 11

3    through 18, they seek an admission to the statement

4    that, and I'm quoting, "Utica has been unable to locate

5    a complete copy of the underwriting files from '76, '83

6    primary policies and number 19 seeking the same

7    admission with respect to the '72 through the '75

8    policies.  As to the '76 to '83 policies, and I'm

9    quoting now, "Utica admits that after conducting a

10   reasonable search, it has not been able to confirm that

11   it has located all pages of all documents that may have

12   been, at any point in time, been contained in the

13   underwriting file for the primary policy that Utica

14   issued to Burnham for all or for any part of the period

15   to the extent such file existed.

16          So, again, Utica has represented that it has

17   produced some but perhaps not all of its underwriting

18   documents; is that right?

19          MS. ALCABES:  Yes.

20          THE COURT:  All right.  And of what you have

21   produced, are there pages of particular documents that

22   appear to be missing or is the entire underwriting

23   document that you might expect an insurance company to

24   maintain that it's missing completely?

25          MS. ALCABES:  Your Honor, respectfully, I'm

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1   going to confer with Chris Lee about this because it --

2   he was handling it.

3                   THE COURT:  Okay.

4                   MS. ALCABES:  If you will bear with us for a

5   moment.

6                   (Pause in proceeding)

7                   MS. ALCABES:  Your Honor, I think the answer

8   to this, again, it may answer the question as to other.

9   I know you have -- are you able to hear me?

10                  THE COURT:  Yes.

11                  MS. ALCABES:  If we had a document from the

12  underwriting file, we produced it.  So, we were under

13  the formulation that you proposed with respect to 21

14  through 28.  To the extent that that gives us more

15  clarity, we certainly understand.

16                  THE COURT:  Okay.

17                  MR. FINNEGAN:  May I chime in?

18                  THE COURT:  Sure.  Go ahead, Mr. Finnegan.

19                  MR. FINNEGAN:  I'm not sure that gives it

20  clarity because the point that we're trying to get

21  across is that they no longer, by year, have complete

22  files and while they may maintain the position that they

23  produced a smattering of underwriting documents, if they

24  have, I haven't seen them beyond pages of the policies.

25  But insofar as they take that position, it's not going

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    to be true of all of the years in particular and that's

2    why we have focused in and would want a specific request

3    by year and it's, you know, helpful to me, candidly, to

4    know whether they are going to take the position, for

5    example, that they have produced the entire '77

6    underwriting files or the entire '78 underwriting file

7    or any record relating to those years.

8              So if we get down into the weeds and they will

9    tell me, yeah, we take the position that we produced

10   documents relating to this, obviously their position is

11   what it is and if I have to disprove it, so be it.  But,

12   I do think it's critically important not to just a

13   wishy-washy response by year.

14             THE COURT:  Okay.  I mean, does Utica contend

15   that it would not have maintained an underwriting file

16   of some sort by year for each of its primary policies

17   back in the '70 and '80s?

18             MS. ALCABES:  I'm sorry.  Your Honor, sitting

19   here today, I can't answer that question.  We -- we can

20   try to find out the answer to that.  To the extent we

21   can provide more clarity by doing it on a year-by-year

22   basis, we're not opposed to doing that.  We just -- we

23   don't have the answer right now.

24             THE COURT:  Okay.  And is there a -- was there

25   a legal requirement under state law that you maintained

1    some sort of an underwriting file or is that just an

2    issue of insurer practices?

3          MS. ALCABES:  I am not aware of a legal

4    requirement but, again, we would have to confer with our

5    client and get -- and, you know, respond on that.

6          THE COURT:  Okay.

7          MS. GOLD:  This is Allison Gold on behalf of

8    R&Q.  I just wanted to point out that one of Utica's

9    underwriters, Dane Austin, when he was deposed, talked

10   about what would be in the underwriting file for the

11   policies because he listed specific types of documents.

12   So, it -- given that testimony, it seems like a

13   pretty -- it should be pretty easy for there to be a

14   straightforward response, the request for admission.

15         THE COURT:  All right.  So, I think where I

16   come out, then, is that -- I'm going to require Utica to

17   respond on a year-by-year basis, to the extent that

18   requires some further reconstruction of what it's

19   produced and what years it relates to and I think

20   eliminate some of the hedging in its response by saying,

21   in substance, Utica admits that after conducting a

22   reasonable search, it has not been able to locate all

23   documents that may have been contained in an

24   underwriting file or the primary policy that issued to

25   Burnham for all or part of that year.  So it takes out a

1    few of the hedging statements and it focuses on a

2    year-by-year basis.

3            With respect to number 19, you know, again,

4    the relevance objection with respect to the underwriting

5    file, while I think the relevance is probably a little

6    more attenuated for the earlier years than for the

7    policy documents, I'm going to require a similar

8    response from earlier years.

9            Okay.  I'm sure I've gotten everything in that

10   group.  All right.  Bear with me here.

11           So let me just -- focusing on the earlier

12   period here for a minute.  Did R&Q make discovery

13   requests with respect to the underwriting files for the

14   earlier time period, the '72 to '75 primary policies?

15           MR. FINNEGAN:  I would be shocked if I did

16   not, your Honor, and I would believe that -- that just

17   as we conceded in an effort to avoid discovery, in

18   bringing things unnecessarily before the Court, we would

19   have relinquished anything prior to '76 as we did with

20   respect to the policy themselves.

21           THE COURT:  All right.  But, Ms. Gold,

22   you referenced some deposition testimony from a

23   representative that sort of talked about what one would

24   have expected to find in the underwriting policies for

25   this time period including the earlier years?

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

1          MS. GOLD:  I believe Mr. Austin began working

2   at Utica -- I think it was in 1979 but he did testify

3   generally what the typical underwriting file would

4   contain.

5          THE COURT:  All right.  And was there other

6   discovery depositions or documents that you did get

7   which indicate that the earlier -- for the earlier

8   years, the underwriting files were also incomplete?

9          MS. GOLD:  Your Honor, the -- the position

10  that we understand Utica to have been taking all along

11  is that --

12         MR. FINNEGAN:  Can I just cut to the quick,

13  your Honor?  The same memos I discussed earlier,

14  including Mr. Austin's August of 1985 memorandum talks

15  about there being a gap in policy documentation between

16  1971 and sometime in the late 1970s.  I believe the same

17  is true of the memorandum that Joseph Sewell prepared.

18  So -- and the short answer to your question is, yes,

19  there are documents that indicate that the pre-1976

20  policy underwriting files cannot be located and/or are

21  incomplete.

22         THE COURT:  Okay.  All right.  So I'm going to

23  stand by my ruling on relevance, that the earlier years

24  are relevant by discovery standards even with respect to

25  the underwriting files and it sounds as if, based on

1    this other discovery, that there wouldn't be an undue

2    burden on Utica to respond to this one in similar

3    fashion to what I've just stated for the '76 to '83

4    policies.

5              Okay.  Any questions or clarifications before

6    I move to the next batch?

7              MS. GOLD:  Not on our end, your Honor.  Thank

8    you.

9              MS. ALCABES:  Not on ours either, your Honor.

10   Thank you.

11             THE COURT:  The next group of depositions

12   relate to requests regarding documents that Utica has

13   obtained from Burnham and/or the broker Alexander &

14   Alexander, which are various groups.  The request

15   between 30 and 65, and the parties seem to routinely

16   refer to Alexander & Alexander as A&A so I will use that

17   shorthand along the way.

18             This series of requests, in my view,

19   highlights R&Q's use of repetitive, overlapping and

20   poorly framed requests.  I'm assuming that the gist of

21   what R&Q would like to pin down Utica on appears to be

22   whether Utica requested and/or received from either

23   Burnham or from A&A documents making up the primary

24   policies or the underwriting documents for those

25   policies when Utica was apparently unable to locate

1    complete copies in its files.

2           It is debatable whether any of our R&Q's 36

3    requests for admissions on this subject really frame the

4    issue clearly.  None of the requests seem to ask whether

5    Utica ever actually requested Burnham or A&A to search

6    for and to provide either primary policies or

7    underwriting documents relating to them.

8           It seems to me that Utica may reasonably lack

9    knowledge of whether it may have requested such

10   information back in the '70s or the '80s; however,

11   whatever point before it came became clear that Utica

12   faced substantial exposure to Burnham on these policies

13   because of the explosion of asbestos claims.  But it

14   would seem that after some point, when Utica realized

15   its exposure on these policies and discovered that its

16   files relating to these policies may have been complete,

17   don't know one way or another whether it requested or

18   received any such documents from Burnham or from A&A.

19          So, with those general comments in mind, let

20   me ask some questions.  Did either side direct

21   third-party document subpoenas to Burnham to or A&A

22   looking for the missing primary policies documents or

23   underwriting files?

24          MR. FINNEGAN:  The answer is yes.  We -- we

25   served subpoenas both on Burnham and on A&A.  With

1    respect to Burnham, we received a production and as far

2    as I could tell, none of the materials -- Burnham, too,

3    was incapable of producing complete copies of the

4    policies that were most interesting to us.  A&A

5    basically told us we have gone through so many corporate

6    changes and -- and reformulations that's currently part

7    of A&A, that insofar as we had any documents, we can't

8    even begin to figure out where to look for them.  So it

9    never went beyond.

10           In answer to -- to a question the Court

11   impliedly asked a moment ago, there are many documents

12   by which Utica wrote to Burnham asking for complete

13   copies of policies and for underwriting information.

14   There is at least some correspondence.

15           THE COURT:  The timeframe of when that

16   started --

17           MR. FINNEGAN:  I know it started at least

18   in -- in the early '90s, '93 or '94 when Mr. Sewell was

19   handling the account and it continued for years to come,

20   and you'll find in many of their internal memos and

21   memos that they provided to reinsurers that they purport

22   to have conducted, quote, an exhaustive search and all

23   I'm -- you know, if they want to turn around now and

24   say, well, we never asked A&A, which I think would be

25   contrary to the record, that's fine.  You know, but

1   having conducted an exhaustive search, you would think

2   that among the various places they would have gone would

3   be the broker and, as I said, there is some correspondence

4   indicating that in 1990s Mr. Turi had gone to the broker

5   and broker said, well, I can't do it unless Burnham

6   gives us permission and Mr. Turi went to Burnham and

7   said -- and I believe it was Berardi (phonetic) who was

8   in charge of Burnham at that point in time and said can

9   you please give permission?  And nowadays nobody can

10  remember what the answer was to that question but

11  presumably they had their eye on where to go and if they

12  didn't get documents, they can certainly tell me that

13  but it's certainly -- based on the record as it now

14  exists, I noted for fact and can establish that they did

15  seek documents from both sources.

16          MS. ALCABES:  Your Honor, I think you hit the

17  nail on the head when you said --

18          THE COURT:  This is Ms. Alcabes?

19          MS. ALCABES:  Alcabes.

20          THE COURT:  Sorry.  I keep mispronouncing your

21  name.  I'm sorry.

22          MS. ALCABES:  You hit the nail on the head.  I

23  find it a little bit troubling that the implication here

24  is the -- somehow Utica has in its file policy documents

25  that we haven't produced.  We already produced all the

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    policy documents, underwriting documents we could find.
2    The problem with this request for admissions is -- the
3    problem is that it's asking -- they're asking for us to
4    go back and reconstruct how it's found all the documents
5    that are contained in its files.  We can't -- candidly,
6    cannot do that.  These are documents that go back
7    decades, and we have produced what we found and R&Q has
8    gone out itself and asked third parties what they have
9    and they have gotten.  So, again, so I don't see how
10   this is going to expand the log except for us to say we
11   don't know where all of the documents contained in our
12   files come from but we have produced everything that we
13   could find.
14           THE COURT:  Okay.  And --
15           MR. FINNEGAN:  Your Honor, can I just address
16   something because they're twisting the issue.  We're not
17   suggesting and we have never suggested that since
18   Simpson, Thacher is sitting on a cache of documents that
19   for some reason they are withholding from us.  I would
20   never make an irresponsible assertion like that.
21           What we're just trying to button down is so
22   that when we go to make motions, we can say not only
23   can't Utica find its own documents, but Utica asked
24   Burnham for documents and Burnham, too, couldn't give
25   them the documents.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

1          We would like to also be able to say that, you

2    know, putting aside what Utica and Burnham could find,

3    they went to A&A and A&A, too, can't find their

4    documents and part of this is, I want to be able to

5    contrast it, candidly, to what happened in the Goulds

6    case, where they did go, eventually they got around to

7    asking the broker for documents and, lo and behold, the

8    broker had some good documents for Utica.  They don't

9    have any similar good documents in this case, they have

10   got nothing and that's what I want to keep being able to

11   establish is, they don't have here what they had in

12   Goulds.  Goulds they might have been able to come up

13   with a colorful argument that aggregate limits were

14   indemned, here they have nothing to establish that and

15   every time they -- they double-talk and they are trying

16   to get around saying, well, we don't really know what we

17   had and we've done our best.  I don't care what

18   you've -- you know, what you -- one thing.  What's --

19   what's important to me is today you don't have them and,

20   therefore, today you can't establish certain

21   propositions because you don't have your underwriting

22   files.  That's what's -- that's what's credibly

23   important or critically important.

24          THE COURT:  And what was the timing of the

25   documents that you were suggesting indicates a

1    representation by Utica that they made an exhaustive

2    search?  Is that also back in the '90s?

3         MR. FINNEGAN:  Those -- those begin in the

4    '90s, and they continue at least as late as 2012.  There

5    may be additional documents that Resolute created once

6    it began but I know that the last one that -- that Utica

7    created I believe is dated June of 2012.

8         MS. ALCABES:  Your Honor, I -- I thought that

9    we kind of dealt with this whole issue and the R.F.A.s

10   that you just directed us to respond to, which is, say

11   yes or no.  Either you have the documents or you don't

12   have the documents.  After having gone through a

13   thorough search, so, I will -- I think, again, we are

14   willing to say what we have found and what we haven't

15   found, so for us to -- to definitively say what we got

16   from third parties, we just can't do that.

17        THE COURT:  Well, Ms. Alcabes, let me ask you

18   this.  I get that if you're talking about, you know, the

19   '70s, the '80s when maybe none of this was really an

20   issue on anybody's radar screen but it sounds like

21   starting in the '90s, there's some -- some documentation

22   that provides Utica with some greater clarity as to what

23   it requested and what it might have gotten.  Is part of

24   your issue that -- the lack of a timeframe in these

25   requests?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1           MS. ALCABES:  I guess -- I think the issue is

2    that if there are documents that indicate one way or the

3    other that requests were made and, you know, those are

4    documents that obviously will speak for themselves, and,

5    you know, R&Q has been able to depose a lot of witnesses

6    about these issues, and to ask whether -- to come out

7    and answer this request for admission one way or the

8    other, it just seems to be asking us to take an

9    unreasonable step further.

10          THE COURT:  Okay.  So let me look at some of

11   the specific ones here, first, it numbers 30 through 37.

12   The request for admission reads, and I'm quoting,

13   "Burnham has not provided Utica with a complete copy of

14   the primary policy that Utica issued to Burnham

15   effective for all or any part of the period January 1,

16   1976, to January 1, 1984, and it seems to me that Utica

17   should be able to provide a qualified admission or

18   denial about whether Utica provided or, I'm sorry,

19   whether Burnham provided Utica with documents embodying

20   some or all of the terms of the primary policies, at

21   least after some date when the documentation indicates

22   that you were making concerted effort to track down the

23   policy documents.

24          You know, if -- even if it -- a qualified

25   answer that said, you know, we requested documents from

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1   Burnham and we have produced everything that we have,

2   including anything that we obtained from Burnham, I

3   think would go a long way towards providing the

4   information that Mr. Finnegan requests and, you know,

5   if -- unless you think you've got documents from Burnham

6   and don't have them anymore, it seems to me if there's

7   documentation that you made requests, you've got what

8   you got, it's not complete, and so, you know,

9   you've produced everything that you got, including

10   anything you requested and received from Burnham, would

11   be something you can provide in a qualified response

12   which meets the substance of it better than your general

13   lack of knowledge or information sufficient to allow you

14   to admit or deny.

15         Now, I admit if you're going back before a

16   period when there's any documentation you -- lack of

17   knowledge may make sense, may be fair, I can't draw the

18   line as to where but it seems to me you ought to at

19   least be able to say, you know, we requested documents

20   from Burnham and we provided all of the policy documents

21   that we had or obtained from Burnham or from, you know,

22   we are going to talk about A&A later, but -- so, I'm

23   going to require further qualified response I guess for

24   30 to 37, along those lines, with the caveat that there

25   may be an earlier time period in which denial of --

1    complete denial of -- the complete denial of knowledge

2    or information may be appropriate.

3            With respect to 48 to 55, that's essentially

4    the same request for Alexander & Alexander.  Again, I

5    think you may be able to make a similar response.  You

6    know, we requested information from Alexander &

7    Alexander to the extent there's documentation that's

8    suggesting that, we provided everything we have got,

9    whether we got it from -- whether it was in our files or

10   whether it was received from Burnham or Alexander &

11   Alexander.

12           With respect to 39 to 46, I know I'm jumping

13   around a little bit here, 39 to 46 reads, and I'm

14   quoting, "Burnham has not provided Utica with any

15   underwriting records for the primary policy that Utica

16   issued to Burnham effective for all or any part of the

17   period from again from January 1, '76, to January 1,

18   '84."

19           You made a denial of that but then in response

20   to 57 to 64 claimed a lack of knowledge with respect to

21   Alexander & Alexander.  I'm trying to understand why you

22   were able to make a substantive response with respect to

23   Burnham but not to Alexander & Alexander.

24           MS. ALCABES:  Your Honor, this is Elisa.  I'm

25   going to let Chris answer this because he was involved

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    in that.

2            MR. LEE:  Yeah, your Honor, I believe the

3    record is -- is clear with respect to what Burnham -- we

4    have a better sense of what Burnham provided to Utica.

5    I think it's a little less clear as to what, if any,

6    underwriting records specifically Alexander & Alexander

7    may have given to Utica.

8            THE COURT:  All right.  But is -- is it clear

9    that you request that Utica requested underwriting

10   documents?

11           MR. LEE:  I think we need to go back and check

12   but I think with Your Honor's guidance on some of the

13   other requests that we have -- that we discussed, I

14   think that we have a clearer sense of what we need to do

15   going forward.

16           THE COURT:  Okay.  So the idea is, even if

17   you're not sure what you've got, if you made a request

18   and can represent that or admit that you have -- you

19   know, you turned over all the underwriting documents

20   that you got and including any that you may have

21   received from Alexander & Alexander that may be a fairer

22   response than just a complete denial of knowledge or

23   information.

24           MR. LEE:  That makes sense, your Honor.  Thank

25   you.

                  Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

1              THE COURT:  Okay.  In light of what I've

2    required with respect to these others, I'm not going to

3    require further responses to 38, 39 through 46, 47, 56

4    and 65.  Based on the -- the more fair responses that

5    I'm requiring of the others because I think they are

6    largely overlapping or duplicative.  Okay?  Any need --

7              MS. ALCABES:  Thank you, your Honor.

8              THE COURT:  -- any qualifications or questions

9    with respect to that batch before I go on to the next?

10             MS. ALCABES:  I think we are clear.  Thank

11   you, your Honor.

12             THE COURT:  Okay.  Next group involves Utica's

13   alleged ability to identify employees involved in

14   certain functions and these include questions 66 to 73,

15   76 to 83, 86 to 94 and 122 to 131.

16             So we will start with 66 to 73, which I'm

17   quoting:  "Utica is unable to identify by name which of

18   its employees participated in underwriting and/or

19   issuing the primary policy that Utica issued to Burnham

20   effective for all or any part of the period, again,

21   talking about the '76 to '83 primary policies."  Utica's

22   response is that -- quoting, "Utica admitted that after

23   conducting a reasonable search, it has not been able to

24   definitely identify by name all Utica employees or

25   former employees who had any involvement in the

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

1    underwriting or issuance of the primary policy that

2    Utica issued to Burnham effective for all or any part of

3    the period," closed quote.

4           So, did R&Q actually propound discovery

5    demands seeking to identify which Utica employees were

6    involved in the underwriting or the issuance of these

7    policies?

8           MR. FINNEGAN:  Certainly by asking them to

9    produce the policies and the underwriting files, we

10   certainly sought that information and since the policies

11   had been produced and in complete fashion, since no

12   underwriting files have been produced, we cannot

13   determine who the underwriter was for the vast majority

14   of these policies and I don't think anybody, based on

15   the documentation that's available, can determine who

16   underwrote any of these or the vast majority of these

17   policies and that goes to the very heart of this, which

18   is, if they're going to be claiming scrivener's error

19   and all sorts of other things, if they can't even tell

20   me who participated, I think that undermines

21   the assertion that there was a mistake because they

22   can't even go back to figure out who did it.

23           THE COURT:  All right, and without -- did

24   Utica identify anybody who was involved in the

25   underwriting or the issuance of these policies by name?

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1        MS. ALCABES:  Your Honor, I believe unless
2   there's something clearer in the documents, we are not
3   aware of any specific identification.
4        THE COURT:  Okay.  All right.  So I think
5   basically the one change that you need to make to the
6   responses, the 66 to 73, is to say you've not been
7   definitively -- not able to definitively identify by
8   name any Utica employee or former employee who had
9   involvement in the underwriting or the issuance of the
10   primary policy.
11        You know, I think the qualifying phrase
12   definitively identified by name is reasonable given the
13   difficulty of figuring out which group of underwriters
14   or other clerical employees who were involved with the
15   particular insured or particular policy more than 30
16   years ago but unless Utica has definitively identified
17   somebody, it seems to be "all" needs to be changed to
18   "any".
19        MS. ALCABES:  We understand, your Honor.  We
20   think that's reasonable.  Thank you.
21        THE COURT:  So number 76 through 83 and 86
22   through 94 are similar questions but relate to whether
23   Utica has identified employees involved in the rating or
24   marking up the primary policies.
25        Utica objects to the terms "ratings" or

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    "marking up" as vague and ambiguous and response to

2    these using the same terminology it used in the prior

3    request 66 to 74 as in terms of people involved in the

4    issuance or the underwriting.  The definitions of these

5    terms and R&Q's request seem fairly clear and they

6    appear to be commonly used in the insurance industry, as

7    reflected in R&Q's Exhibit 1 paragraph 22 and 23 at page

8    7 docket number 109-3 of 8.

9             Arguably, both functions, rating or marking up

10   would be included in the broader terms of issuing an

11   underwriting and are duplicative but the persons

12   involved in these more specific functions would

13   presumably be more likely to have information about why

14   explicit products aggregate limits were not written on

15   some of the primary policies.

16             So I'm -- I guess I'll start with the

17   question:  I'm assuming if you couldn't identify anybody

18   definitely who was involved in underwriting or issuance,

19   you also couldn't identify anybody who was involved in

20   rating or marking up.

21             MS. ALCABES:  Your Honor, I think -- I mean,

22   it seems to me, given your comment, that perhaps the

23   best way for us to deal with these are just to refer to

24   our response to 66 to 73.

25             THE COURT:  Well, yeah, except I think you

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    also need to be responsive to the more specific terms of

2    rating or marking up.  I mean, in other words, I don't

3    think those terms are vague or ambiguous.  You know, I

4    am presuming, based on the definitions from R&Q, and I

5    think it's a reasonable presumption that, you know,

6    those are sort of relatively clear functions and, you

7    know, the bottom line is, you can't figure out at this

8    point who did that back then.

9            So I'm just saying same response but you can't

10   just say not -- don't know who was involved in

11   underwriting or issuance.  You've got to incorporate the

12   specific phrasing in the questions in terms of rating or

13   marking up.

14           MS. ALCABES:  We understand.

15           THE COURT:  Okay.  I guess the other thing is,

16   again, if you didn't identify anybody, then you've got

17   to change --

18           MR. FINNEGAN:  "All" to "any".

19           THE COURT:  "All" to "any".  Thank you.  All

20   right.  Next group is requests relating to the alleged

21   absence of aggregate limits in the primary policies or

22   products aggregate limits in the primary policies,

23   requests number 97 to 100, 101 to 104, 105, 106, 108 to

24   115, 116 and 122 to 131.

25           This series of requests asks in a number of

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    different ways about the apparent omission or absence of

2    an explicitly stated products aggregate limit in some of

3    the Utica-Burnham primary policies.

4         Utica's response includes various objections,

5    including the arguments that R&Q's request to rely on a

6    false premise that the policies lack products aggregate

7    limits, Utica doggedly repeats its mantra that none of

8    these policies lack such limits, notwithstanding the

9    absence of certain language or dollar amounts in the

10   policy documents.

11        In my view, Utica has clearly evaded

12   responding to R&Q's more specific efforts to ask about

13   the omission of dollar amounts for products aggregate

14   limits in some of the policies.

15        I recognize that the alleged absence of these

16   limits in some of the primary policies is a hotly

17   disputed issue that is critical to the claims and

18   defenses in this case.  However, as I stated earlier,

19   the fact that an issue or -- is disputed or central to

20   the litigation does not permit a party to avoid

21   admitting a request for ignoring or evading the factual

22   substance of that request.  The request that provides

23   the most specific and objective description of the

24   admission of a stated or explicit products aggregate

25   limited and which best highlights the evasiveness of

1    Utica's response are number 101 through 104, involving

2    the '80 to '83 primary policy.  The request is that --

3    I'm quoting, "the primary policy that Utica issued to

4    Burnham for the period and, again '80 to '83 policies,

5    lacks a specific, I'm sorry -- lacks a stated products

6    aggregate limit, particularly, the space in front of the

7    word 'aggregate' or 'blank comma 000 aggregate' in the

8    limit of liability section is blank," closed quote.

9            Utica's response is that Utica denies that the

10   primary policy that Utica issued to Burnham for the

11   period or any part thereof lacks a products aggregate

12   limit.  The extent these requests characterize a

13   document, Utica refers to that document for the complete

14   and accurate contents thereof," closed quote.

15           Utica's denial that the policies lack products

16   aggregate limits, in my view, evades the parts of the

17   request that asks for Utica to admit that a specific

18   spot on one of the policy forms was left blank for

19   several years.

20           The Booth Oil, which I cited earlier,

21   indicates that Utica's effort to evade responding to the

22   specifics of such a request and its efforts to object by

23   saying, in essence, that the documents speak for

24   themselves are not proper objections under Rule 36.

25   Booth Oil, 194 F.R.D. at 80, which denied objections to

1    request for admissions about language in a business

2    agreement, and I'm quoting, "on the grounds that they

3    seek an opinion, the termination of a document and that

4    the document, which is the object of the request, speaks

5    for itself," closed quote.

6           The Court in Booth Oil continued.  I'm quoting

7    again, "As a statement of a document" -- I'm sorry.  "As

8    a statement of a document's text is a matter of fact, a

9    request calling upon a party to admit or deny that such

10   quoted material is the actual text of an identified

11   document, relevant to the case, may not be ignored on

12   the ground that the request seeks an interpretation of

13   the text or that the document in question speaks for

14   itself.  It is permissible to request that a party admit

15   or deny a Rule 36 request as to the accuracy of the

16   quoted textural material from a particular document

17   relevant to the case."  That's Booth Oil at page 80.

18          Now, I understand completely that Utica

19   contends, and has successfully argued in other cases,

20   including in connection with the Goulds Pumps primary

21   policy with similar blanks or omissions that the parties

22   to the agreement intended that they have specific

23   products aggregate limits.

24          So I would interpret the request in a more

25   limited fashion or maybe more appropriately allow a

1    qualified response in a more limited fashion in that,

2    you know, the primary policy lacks a stated products

3    aggregate limit in that, the space in front of the word

4    "aggregate" or "000 aggregate limit" section.  I guess

5    what I'm saying is -- I'm sorry.  What I am saying is

6    that Utica cannot ignore the specifics of the factual

7    question there in terms of blanks in a particular place

8    on the form by just invoking -- meant to have limited or

9    intended to have limits but it does not have to

10   necessarily adopt the specific phrasing of -- does not

11   have to suggest that the blank is a -- one example of

12   ways in which the policy lacks a stated products

13   aggregate limit.

14           So rather than saying more particularly, the

15   space is blank, they can say it lacks a stated products

16   limit in that the space in front of the word "aggregate"

17   is blank.

18           So with respect to the many other questions of

19   this sort, again, Ms. Alcabes or Mr. Lee, I take it the

20   omission or the blanks not filled in for the products

21   aggregate limit took a slightly different form in some

22   of these other policies?

23           MS. ALCABES:  I'm sorry, your Honor.  I'm not

24   sure I follow.  I think in terms of the --

25           THE COURT:  Here, let me try.  You asked a

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    very specific question for the '80 to '83 policies, that

2    there's a particular blank on the form and it's not

3    filled in.  You don't ask the question in the same way

4    with respect to other years.  So I'm assuming that there

5    was some change in the wording of the form and, you

6    know, they -- it's still not an explicitly stated

7    numerical amount for a products aggregate but it may be

8    reflected in some different fashion.

9              MS. ALCABES:  Are you directing this question

10   to R&Q?

11             THE COURT:  Yes.

12             MS. ALCABES:  Okay.

13             MR. FINNEGAN:  The answer is yes.  It's our

14   understanding that, over time, there were at least two

15   different versions of an endorsement that were used.

16             We can establish, based on the limited policy

17   documentation that has been produced with respect to '80

18   to '83, that the endorsement in those years was what

19   Utica called their L-203 endorsement.  I believe, based

20   on other documents, that the same endorsement may have

21   been used as early as 1977 but since I haven't seen what

22   specific document was used there, I couldn't tie it

23   directly to the L-203 and had, instead, to ask the

24   question more generically because we are both

25   functioning in the blind in terms of what endorsement

1   was actually appended to that policy and can only rely

2   on extraneous documents to tell us that whatever the

3   endorsement was, it contained a stated aggregate limit.

4           THE COURT:  Okay.  So not only -- so in some

5   cases, the key forms for particular years may not have

6   been produced.

7           MR. FINNEGAN:  That's correct.

8           THE COURT:  And then starting in the '84

9   primary policies, there now starts to be an explicitly

10  stated dollar amount for the aggregate products,

11  aggregate limits?  Is that sort of in the same form that

12  we're -- that was used in '80 to '83 or do they change

13  the form as well?

14          MR. FINNEGAN:  My recollection is that in '84

15  they may have switched over to the -- I'm going to get

16  it wrong -- the GL0099 or 19 form or something like

17  that.  My -- my belief is that they did switch.  There

18  were different forms in either '84 or '85.

19          THE COURT:  Okay.  Is there other discovery in

20  this case in which Utica's representatives appear to

21  acknowledge the absence or the omission of a stated

22  dollar amount for these products aggregate limits in

23  some of these other primary policy where you either

24  don't have the forms or the -- or the format of the

25  forms might have been different?

1           MR. FINNEGAN:  There are multiple documents

2    that refer to it and I believe, depending on the

3    witness -- for example, I think Mr. Turi has

4    characterized it as the documentation issue but he

5    does -- he, too, acknowledges that there are -- there is

6    not an explicit aggregate limits stated in a host of

7    policies.

8           THE COURT:  Okay.  All right.  So let me

9    circle back now to some of the other requests in this

10   category.  Starting with 97 to 100 which states, where

11   the request states, and I'm quoting, "The primary policy

12   that Utica issued to Burnham for the period January 1,

13   '76, to January 1, '80, which would be the '76 to '79

14   years, lacks a stated products aggregate limit."

15          So, obviously the question is posed more

16   generically because it's less clear what form was used

17   or, you know, what was -- what blank wasn't filled in.

18   Not having seen the other discovery that reflects the

19   lack of a specific or stated products aggregate limit, I

20   think Utica has to come up with a qualified response

21   which perhaps uses different phrasing than a stated

22   products aggregate limit because maybe that's somewhat

23   debatable and -- but I think something like, you know,

24   you would need to admit or deny whether the policy and

25   I'm -- this is language I'm suggesting, lacks an

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    explicitly stated dollar amount for products aggregate

2    limit.

3              I would think the need to be a reasonable,

4    more generic phrasing that you would either admit or

5    deny.  Now, there may be room for qualification, you

6    know, to the extent the key documents -- the key policy

7    documents are missing and the other discovery may be

8    more ambiguous.  So I'm not ruling out the possibility

9    that in some cases you might, you know, not be -- you

10   might not have knowledge or information or you might

11   deny or you might admit but it seems to me you can't

12   just avoid responding to all these questions because you

13   think stated products aggregate limit is ambiguous or

14   too general.

15             So, again, I'm not telling you exactly what

16   phrasing to use but lacking in explicitly stated dollar

17   amount for the products aggregate limit would seem a

18   reasonable way to respond to the gist of the request in

19   97 to 100.

20             MS. ALCABES:  Your Honor, we understand where

21   you're going with this and we appreciate the guidance.

22   We will -- we will confer with our client as to the

23   formulation that we think may be appropriate.  We are

24   not going to admit that these policies have no aggregate

25   limit.  So, you know, at the end of the day, there is no

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1   admission that -- that the primary policy don't have

2   aggregate limits but we can figure out a way to

3   formulate it in a way that's more satisfactory to R&Q.

4          THE COURT:  Okay.  But I guess, you know, it's

5   not a -- it's not a question of satisfied.  The question

6   of answering the question and if the question is, is

7   there a blank on this particular form for this year and

8   that's -- there is a blank on the form, you can't evade

9   that by saying, well, we all intended to have one,

10  essentially.

11         MS. ALCABES:  I understand.

12         THE COURT:  Okay.  105 and 106 seek admissions

13  that one or more or all of the '72 to '75 policies lack

14  a stated products aggregate limit.  Again, I'm going to

15  overrule the relevance objection to the earlier years,

16  and I would require a less evasive response from Utica

17  with respect to the earlier policies but I understand.

18  I proposed, you know, an example of generic language

19  that I think might be more responsive but, again,

20  depending on what documentation exists with respect to

21  the earlier policies, I'm not precisely dictating how

22  Utica should respond to that.

23         You know, for example, the fewer policy

24  documents that are found or the fewer other discovery

25  documents that relate to the earlier policies may

1   provide an ample basis for denying knowledge or whatever

2   but you can't just ignore the phrasing of the -- of the

3   question.

4           108 to 116 seeks an admission that -- and I'm

5   quoting, "the available documentation evidencing each of

6   the 1972 to 1983 policies lacks a stated products

7   aggregate limit."  This request would seem to be

8   duplicative and unnecessary except to the extent that

9   Utica is going to qualify its response to the other

10  prior requests that we have just discussed on the basis

11  that the relevant portions of these policies still have

12  not been located.  So if Utica doesn't qualify its

13  responses based on missing policy documents, I would not

14  require a further response to these requests.

15          Utica contends that the word or phrase

16  available documentation evidencing and stated product

17  aggregate limits are vague and ambiguous.  To the extent

18  Utica has to respond to these because a qualified

19  responses to other requests, I would allow Utica to use

20  phrasing, for example, currently available documentation

21  establishing or embodying the terms of the primary

22  policy lacks an explicitly stated dollar amount for

23  products aggregate limits or words to that effect.

24          Utica might also reasonably further qualify

25  its response by stating to the extent it's applicable

1    that portions of a particular policy relevant to a

2    products aggregate limit are not currently available or

3    not been located after a reasonable search.

4                Request 122 to 131 requests Utica to admit

5    that it cannot identify by name the individuals who made

6    the scrivener's error that resulted in the omission of a

7    stated products aggregate limit in the '72 to '83

8    policies.  Utica responded, as it did in respond similar

9    questions about the identify of employees with

10   knowledge, that after conducting a reasonable search, it

11   has not been able to definitively identify by name all

12   Utica employees or former employees who had any

13   involvement in the underwriting or issuance of the

14   primary policies.

15               I will discuss in a moment in connection with

16   later requests the reference to the scrivener's error

17   explanation that Utica has provided in another

18   litigation with respect to the explicitly -- the lack of

19   explicitly stated dollar amounts for products aggregate

20   limit.

21               While Utica need not expressly respond to that

22   phrasing, it cannot ignore that R&Q is asking about the

23   identity of Utica employees responsible for the lack of

24   an explicitly stated dollar amount for products

25   aggregate limit in certain of the Utica-Burnham primary

1    policies who may well be, but are not necessarily, the

2    same people involved with issuing and underwriting the

3    policies.

4          So Utica is directed to provide a qualified

5    response using reasonable or appropriate phrasing with

6    respect to the identity of the employees responsible for

7    the clerical or documentation or scrivener's error

8    resulting in the lack or the omission of an explicitly

9    stated dollar amount or the products aggregate limit in

10   certain of its primary policies.

11         As with earlier responses of this type, Utica

12   will be required to state that it couldn't identify any

13   involved employee unless it has actually definitively

14   identified such employees by name in connection with

15   prior discovery.

16         All right.  Let's take another three-minute

17   break and then hopefully we can get the rest of this

18   wrapped up.  Okay?

19         MR. FINNEGAN:  Thank you, your Honor.

20         MS. ALCABES:  Sure.

21         (Pause in proceeding, 3:20 P.M.)

22         THE COURT:  So now looking at requests

23   regarding Utica's litigation position, in particular,

24   number 118 to 120.  Requests 118 to 19 asks Utica to

25   admit that its, and I'm quoting, "Its position in this

1   action is that each of the '72 to '83 primary policy

2   provides for a products aggregate limit of liability.

3   With respect to those years, Utica admits that the

4   policy contained a products aggregate limit."

5            I would think that the phrasing would seem to

6   suggest an inaccurate overstatement as to the wording of

7   the primary policies that Utica might be well advised to

8   reconsider but, as I said earlier, my role at this stage

9   is not to rule on the factual accuracy of the responses,

10  so I'm not going to direct you to do that.  I just --

11  you know, given what we've talked about in terms of

12  phrasing, you may want to think about a more precise

13  answer but I'm not going to direct that because, again,

14  you've made a -- you've made a response that I'm not

15  going to get into the accuracy of.

16           With respect to the '72 to '75 policies, Utica

17  repeats its prior objections based on relevance which I

18  would overrule, same reasons stated earlier, and require

19  a response which presumably would mirror the response

20  that Utica made with respect to the '76 to '83 policies

21  whether, as originally stated, or as they might

22  reformulate it.

23           To the extent Utica is objecting to the phrase

24  "products aggregate limits" as vague and ambiguous, I

25  overruled that objection.  Request number 120 asks Utica

1    to admit its, and I'm quoting, "position in this action

2    is that several primary policies lack a stated products

3    aggregate limit due to a scrivener's error or, as

4    Bernard Turi testified during his deposition, due to an

5    documentation error or documentation issue."

6           Based on my prior discussion, Utica's response

7    that the policies contain a products aggregate limit is

8    not reasonably responsive for the phrasing of the

9    question.  Utica is directed to make a qualified denial

10   or admission to the request along the lines that one or

11   more of the primary policies lacks an explicitly stated

12   dollar amount for products aggregate limit because, and

13   then phrase Utica's explanations that the purported

14   clerical error in whatever terms are accurate and

15   reasonable and appropriate.

16           I -- you know, I don't think you necessarily

17   have to adopt Mr. Turi's particular language as speaking

18   for the entity or the scrivener's error that you may

19   have used in the Goulds litigation but I think you have

20   to acknowledge that there's some critical mass of

21   statements attributable to the Utica agent, that there

22   was some sort of error or oversight in however you

23   characterize it.  I think you can't just avoid admitting

24   or denying that there was some sort of error or

25   oversight that resulted in the lack of explicitly stated

1    dollar amount in some of the policies.

2         All right.  The next category is further

3    requests regarding Utica's claim of scrivener's errors,

4    requests 132, 133 to 136, 137 and 155.  R&Q in this

5    series of requests attempts to get Utica to admit that

6    it has no evidence beyond the conclusory post-hoc

7    speculation of certain witnesses to explain the lack of

8    an explicitly stated dollar amount for products

9    aggregate limits in certain of the primary policies.

10        The series of requests is, in my view, poorly

11   phrased and Utica's objections that the questions are

12   vague are, for the most part, reasonable.  The clearest

13   request, in my reading, is number 132, and Utica's

14   denial that any of the primary policies lack a products

15   aggregate limit evade this request in the same fashion

16   as do many of the Utica's prior responses.

17        So I'm going to direct that Utica provide a

18   qualified admission or denial of 132.  Again, the

19   response cannot ignore the focus of the request on the

20   lack of an explicitly stated dollar amount for products

21   aggregate limit in one or more of the primary policies.

22        As with some of the prior requests, Utica does

23   not necessarily need to adopt the scrivener's error or

24   documentation error language of the request but must

25   address whether Utica has an explanation why an

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1   explicitly stated dollar amount for products aggregate

2   limit in one or more of the primary policies was not

3   included.

4            I will not require a further response to

5   number 133 to 136 or 137 based on the unclear drafting

6   of those responses to my requirement that there be a

7   further response to number 132.  With respect to 155

8   seeking an admission that Utica did not seek to

9   determine whether primary policies for insures other

10  than Burnham and Goulds lack explicitly stated dollar

11  amount for products aggregate limit, I will not require

12  a further response.  I believe that I have previously

13  taken the position that discovery about whether policies

14  with other insureds lacked such limits was not

15  proportional given the volume of discovery on that issue

16  available to the defendant regarding limits in the

17  Goulds Pump policies.

18           Requiring Utica to conduct the investigation

19  necessary to respond with respect to other insureds in

20  connection with request number 155 would also not be

21  proportional and would be unnecessarily burdensome on

22  Utica, in my view.

23           The next --

24           MR. FINNEGAN:  Your Honor --

25           THE COURT:  Go ahead.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1          MR. FINNEGAN:  Would it be appropriate for me

2    to ask you to reconsider your ruling with respect to

3    request 136?  And what I'm trying to get at, and maybe

4    you're right, but some of the others were poorly

5    phrased, but the point is very simply that there's a

6    series of policies that lack a stated aggregate limits,

7    explicit aggregate limits.

8          What I want to get across is that Utica can't

9    tell us today whether the same mistake was made in each

10   of those policy years or whether a different mistake was

11   made in different policy years and as I said, you know,

12   you may disagree with our phraseology but I think 136 is

13   pretty clear in that respect in trying to get Utica to

14   acknowledge that today it can't tell me whether it was

15   the same or different error that resulted from year to

16   year.

17          THE COURT:  Okay.  But, you know, I think the

18   bottom line is, they're probably going to admit that

19   they cannot explain the error at all, so that

20   presumably -- their response to 134 I would think would

21   make 136 duplicative and, with all due respect, I don't

22   think the phrasing is all that clear.  I get it.  Was it

23   the same screw-up or different screw-up over a period of

24   eight or ten years or whatever it was, but the bottom

25   line is, they don't seem to have a very good handle on

1    that.

2            So, I'm giving you one question where I think

3    they're going to have to respond to that one way or the

4    other and the others phrase it in less elegant ways that

5    I don't think it's going to bring any clarity to the

6    subject.

7            MR. FINNEGAN:  Can I take a crack at one more

8    and maybe at the end of this I'm going to feel like

9    "Casey at the Bat" and I just keep swinging and striking

10   out but with respect to 155, we're not asking them to go

11   back and conduct an investigation.  We -- we don't

12   believe that they ever did try to seek if other policies

13   lack an aggregate limit and the reason that becomes

14   important is their witnesses want to be able to testify,

15   oh, well, we never did this.  Well, surprise, surprise.

16   They're too big asbestos insured, Goulds and Burnham.

17   They are going to have the same problem in both

18   policies, no aggregate limit.

19            If a rational, a good company would

20   reflectively have gone back and said we are going to see

21   how big this problem is so we can contain it and see if

22   this was done with respect to any other policies.

23            All I want them to acknowledge is they

24   never did what I believe a rational company would do and

25   try to find out how pervasive the issue was.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1           THE COURT:  Never since when?

2           MR. FINNEGAN:  Never since 1985 when they --

3    they first identified that there was an absence of an

4    aggregate limit in the Burnham policy.

5           THE COURT:  Yeah.  Well, I mean, so you're

6    talking about 30 years ago?  Right?  And how are they

7    going to figure out that they never looked into it for

8    some other insurer when all the employees are long gone,

9    they haven't necessarily done document discovery with

10   respect to the other insurers because there hasn't been

11   litigation?  I don't see how you can say that it doesn't

12   require extensive investigation for them to be able to

13   admit or deny that question.

14          MR. FINNEGAN:  Because the people that have

15   been handling the claim, Mr. Turi in particular, both

16   with respect to Gould's and with respect to Burnham, had

17   been involved with the -- with the claims from the

18   get-go.  If they had conducted an investigation, a

19   broad-based investigation to determine if it existed in

20   other policies, they would have said so.  They would

21   have been able to be in a position.

22          And I'll tell you, I've already asked in

23   that -- at the end of the day, I already know the answer

24   is because in the -- in the Gould's arbitration, I had

25   the opportunity to ask a whole bunch of them:  Did you

1    ever do this?  You know, you take the stand and you tell

2    me, well, we never had this type of problem and that's

3    all fine and good.  That's -- I tell the panel:  Did you

4    ever go back to investigate whether you had that issue

5    in another?  No, we never did that.

6              So I already know what the answer is.  That's

7    why I want to do it now because they know what the

8    answer is too.

9              THE COURT:  Okay.  You know, then maybe you

10   should have phrased the question a little more

11   specifically in terms of some of the people who made

12   that admission.  I mean, one of the problems that have

13   when you are making a -- asking a question or posing a

14   request that reflects the state of mind of an entity is,

15   you know, it's -- obviously the state of mind of the

16   entity is somehow based or related to the state of mind

17   of the agents or employees but, you know, Bernard Turi

18   or whoever it is that you may have talked to or deposed

19   in the prior litigation isn't necessarily the one who

20   determines the state of the minds of the entity and

21   particularly when you're talking about a 30-year period,

22   pretty tough thing to answer.  Dually noted.  Strike

23   three.  You used your "Casey at the Bat" analogy.  All

24   right.

25              You only get one at bat so I'm now going to

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

turn to request regarding the drafting of the umbrella policies, request number 185 and 186.  185 seeks an admission that Utica was unable to identify by name the individuals who drafted particular language in the 1977 to 1985 umbrella policies.

Utica's response is similar to the prior responses seeking to identify employees involved in other activities involving the primary policies.  For the same reasons discussed in connection with prior requests, Utica should respond that it has not been able to definitively identify anyone who was involved in drafting this language if they have not, in fact, identified anyone by name in connection with prior discovery.

Request number 186 is poorly drafted in part because it does not specify a timeframe during which Utica might have communicated with someone involved in drafting the particular language of the umbrella policies of the '70 and '80s and it doesn't specify the nature of the communication it is asking about. Presumably, somebody from Utica would have communicated with the persons involved in drafting the umbrella language at least when the language was drafted more than 30 years ago, but reconstructing such communications now would be unduly burdensome.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    So I'm going to sustain Utica's objections and

2    won't require a further response by Utica to number 186.

3    The next group of the requests relates to

4    Utica's practice of paying defense costs under its

5    umbrella policies, request number 189 to 193.  Number

6    189 requests an admission to the following statement:

7    Quoting, "where an umbrella policy contains language

8    identical to Section II of the 1977 to 1985 umbrella

9    policy jacket, the practice within Utica is and always

10   has been to extend coverage for defense costs to the

11   insured under the umbrella policy following exhaustion

12   of the underlying primary policies limits, that, in

13   parentheses, defined the term defense costs practice."

14   Utica has objected to this request on a variety of

15   grounds, including vagueness and incomprehensibility

16   and relevance."

17   So, are we talking about the coverage-by

18   language in the umbrella policies or something else?

19   MS. GOLD:  Yes.

20   THE COURT:  And has Utica, in fact, contended

21   in this or related litigation that it has always paid

22   defense costs under the umbrella policies that R&Q

23   reinsured when the limits of the underlying policies

24   have been exhausted as R&Q claims in its brief?

25   MS. GOLD:  Your Honor, this is Allison Gold.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    Yes, it's my understanding.

2            THE COURT:  All right.  And how and where has

3    it made that contention?  Allison, now I'm confused.

4    How and where is it made that contention or to the

5    extent that you can tell me?

6            MR. FINNEGAN:  If it's okay, I will chime in

7    again, but it's made that contention in deposition, it's

8    made that contention in various of -- I believe some of

9    the discovery briefs that have been admitted to this

10   Court and certainly made that contention in its

11   mediation statement.

12           THE COURT:  Okay.  So, how does the language

13   of Utica's prior statements of its position differ from

14   the language of this request, if at all?

15           MR. FINNEGAN:  I'm not sure that it does.

16           THE COURT:  Okay.  And from Utica's

17   perspective, I mean, has Utica taken the position that

18   it's consistently interpreted the covered-by language to

19   require that it paid defense costs under the umbrella

20   policies when the limits of the primary policy's been

21   exhausted?

22           MR. LEE:  I think the issue -- this is Chris

23   Lee from Simpson.  I think the issue, your Honor, is

24   that -- so if you look at request 189, it's talking

25   about every possible policyholder that Utica has ever

                    Lisa L. Tennyson, CSR, RMR, FCRR
                   UNITED STATES DISTRICT COURT - NDNY

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1       issued umbrella policies for and so, you know, while we

2       have consistently taken that position with respect to

3       the Burnham account and while we believe that that's

4       been the case, I think to try to confirm that and admit

5       that conclusively in the context of this request is just

6       unduly burdensome and we think outside the scope of what

7       their Rule 36 requires.

8               MR. FINNEGAN:  If this Court will give us a

9       ruling right now that their witnesses can't take the

10      stand and make broad pronouncements about what they did

11      with regard to other policyholders and that their only

12      position is that they have done it consistently with

13      regard to Burnham, I'll take that.  Because the fact is,

14      the reason for asking this is their witnesses come up

15      and it's -- this is what we did with everybody.

16              So I want to find out whether that's true or

17      not.  I'm entitled to that.  They're -- once they make

18      that statement, I'm -- I should be given some leeway to

19      get there.

20              THE COURT:  I guess -- I guess what I'm

21      suggesting here is that there are two ways to ask this

22      question.  You know, one is in terms of has Utica taken

23      the consistent position that it has interpreted this

24      language, this covered-by language to require that it

25      pay defense costs under certain circumstances and the

1    other is with -- your questions are in terms of what was

2    its practice and, you know, it gets into I think a much

3    broader inquiry whether its actual payment practices

4    across the board were consistent with that

5    interpretation and, you know, we have had similar

6    discovery disputes in the past in terms of, you know,

7    whether Utica has or -- has acted may have gone for both

8    sides of the -- of the actions but, you know, whether an

9    insurer or reinsurer has been consistent in applying its

10   supposed uniform interpretation of a policy or a

11   certificate in actual practice and it seems to me that

12   that's a -- a pretty burdensome request to the extent

13   it's not narrowed.

14           On the other hand, Booth Oil case, 194 F.R.D.

15   at 80 to 81, ruled that a party's request to admit their

16   understanding of a business contract meaning or intent

17   of the party is not objectionable.  That's a case that

18   stated that the requests at issue do not relate to

19   material which, like a line of lyrical poetry, may be

20   subject to multiple interpretations.  Rather, they are

21   directed to business agreements involving the parties to

22   the instant litigation, using standard clauses applied

23   to particulars of the transactions," closed quote.

24           So, 189 does not seem to ask about the

25   interpretation of the covered-by language.  It seems to

1  ask whether Utica had a consistent practice to actually

2  extend coverage and make payments consistent with that

3  interpretation and suggests that Utica has a duty to

4  investigate whether it actually covered defense costs

5  under these circumstances without limitation to

6  timeframe, identity of the underlying insured or the

7  context of the coverage, whether it's asbestos claims or

8  something else.

9         So that -- that broad context would seem to

10  exceed the scope of prior discovery in this and other

11  cases and impermissibly use a request for admission is

12  an initial tool for discovery as opposed to tool for

13  narrowing the issues for trial and going back to the

14  Wiwa case, 2009 Westlaw 1457142 at page 4, I think that

15  stands for the proposition that to the extent R&Q is

16  using a request as an initial means of gathering

17  information about earlier policies, request for

18  admissions are not supposed to be used as a primary

19  discovery device but as a way to narrow the -- the

20  motion -- narrow issues for motion practice and trial

21  based on the results of prior discovery.

22         I also cite the T. Rowe Price Small Cap

23  Funding versus Oppenheimer case, Southern District of

24  New York case 97 174 F.R.D. 38 at 42.  So, I'm pretty

25  sure I have not allowed that breadth of discovery in

1  this or in other cases.  So I -- you know, the way you

2  phrased that I don't think works.  On the other hand, I

3  would be inclined to require Utica to make a qualified

4  denial or admission to what I would consider a narrower

5  interpretation of the request that Utica has

6  consistently interpreted not-covered-by language or the

7  language of Section 2 of the policy jackets in these

8  particular years, to require coverage of defense costs

9  under the umbrella policies when the limit of the

10 underlying primary policies have been exhausted.

11          That, to me, the investigation required

12 respond to that request is something that can be done

13 within discovery that's already been conducted and

14 doesn't, you know, require you to go back and search for

15 possible examples where you haven't applied that.

16          So, whether I'm out of -- modifying the

17 question or whether I'm, you know, allowing a more

18 qualified answer I suppose is -- is a -- is a little

19 unclear but I'm -- I think what I'm -- what I am saying

20 is that I think Utica needs to make a qualified denial

21 or admission with respect to its -- whether it has a

22 consistent position to interpret that language to

23 require coverage of defense costs under the umbrella

24 policy when the limit of the underlying policies have

25 been exhausted.

1          MS. ALCABES:  Your Honor, this is Elisa

2    Alcabes.  I think we understand your guidance and we

3    appreciate it but just to be clear, it's not opening the

4    door for R&Q to then go out and ask us for more

5    discovery about how we have handled other policyholder

6    matters.

7          THE COURT:  Right, and I have -- you know,

8    I've -- I don't think in this case but in some of my

9    prior cases I've certainly adjudicated discovery

10   disputes about that kind of discovery and, you know,

11   have not certainly allowed it to the breadth that's been

12   allowed, that suggested by this particular request and,

13   you know, my -- I think it would be fair to say that --

14   consistent with my best recollection of my prior

15   rulings, you know, I might have -- allow you to

16   reference whatever discovery and -- in the Goulds case

17   may -- may be relevant to this or something like that

18   but I certainly wouldn't open up discovery more broadly

19   than that.

20         MS. ALCABES:  Thank you.

21         THE COURT:  Now, the following question, 190

22   to 193 asks, you know, the follow-up questions with

23   respect to the defense cost practice which is, you know,

24   which I've essentially recast the -- or narrowed the

25   request.  190 asks Utica does not know when the -- this

1    interpretation of the umbrella policy language began.

2    Number 191, Utica does not know why this construction of

3    the umbrella policy language was adopted.   192, Utica

4    does not know who made or approved that interpretation

5    of the policy.

6            Requests like this, which asks for admissions

7    about the knowledge of an entity without limitation as

8    to timeframe, are properly subject to objections.   Even

9    if the request was narrowly construed to focus on

10   Utica's interpretation of the key language of the

11   umbrella policies as opposed to a broader practice, a

12   substantive response would appear to require

13   investigation going back 30 years or more through the

14   present which seems unduly burdensome and not

15   proportional to the needs of the case.

16           It is not clear how Utica should determine

17   when the knowledge of an employee or an agent, assuming

18   it found evidence of such knowledge, should be

19   attributable to the entity.   So I'm not going to require

20   further responses to those three requests, even under

21   the narrower construction that we're talking about, the

22   interpretation of the policy language as opposed to the

23   practice of implementing that interpretation.

24           Request number 193, however, is phrased there

25   are no documents indicating when, why or by whom the

1    defense cost practice -- I'm sorry -- the defense cost

2    practice was adopted and, again, I would -- construing

3    this more narrowly in terms of the interpretation of the

4    key language.  I would say this request is phrased in

5    terms of more objective criteria and not the state of

6    mind of an entity.

7            So consistent with my ruling on 189, this

8    request narrowly construed to focus on Utica's

9    interpretation of the not-covered-by language of the

10   umbrella policies is something that Utica should be

11   required to respond to.

12           Given that Utica has addressed the defense

13   cost issue in this and other reinsurance litigation and

14   discovery, it's safe to assume that reasonable

15   investigation has already been made to locate

16   documentary evidence supporting the interpretation of

17   the "covered-by" language that Utica has advanced in

18   this and other litigation.

19           Unlike 190 to 192, responding to this request

20   wouldn't seem to require interview of former employees

21   but only review of documents that have already been

22   produced in this or related litigation.  So I'm going to

23   direct Utica to make a qualified denial or admission to

24   193 as narrowed but not to 190, 191 or 192.

25           The next group relates to Utica communications

1   with Burnham, requests 209, 215 to 217, 223, 229, 230,

2   252.  Request number 209 reads:  Utica has never

3   communicated with Burnham regarding the absence of a

4   stated products aggregate limit in one or more of the

5   primary policies Burnham purchased from Utica.

6           Utica's response:  Utica admits that the

7   primary policies are subject to the products aggregate

8   limit and that it has discussed the amount of coverage

9   available to Burnham for the Burnham -- claims with

10  Burnham.  Utica's response, like many prior responses to

11  requests in terms of the absence or lack of a stated

12  products aggregate limit is nonresponsive.  Consistent

13  with prior rulings, Utica is required to make a

14  qualified admission or denial using phrasing like

15  explicitly stated dollar amounts for product aggregate

16  limits but cannot rely on unresponsive language it has

17  used in its response.

18          I will consider a possible qualification based

19  on timeframe.  It's conceivable that for an earlier, you

20  know, a time period in the distant past, that a denial

21  of knowledge or sufficient knowledge or information

22  after reasonable investigation may be appropriate and,

23  you know, there also could be more recent communications

24  in the last year or so with respect to the settlement

25  discussions where the issues have been clearly

1    discussed.

2            And so, the qualifications of the answer might

3    reasonably distinguish between different time periods so

4    as not to support a misleading inference.

5            Request 215 to 271.  Number 215 reads:  "Utica

6    has communicated to Burnham the fact that re-insurance

7    is available to Utica on the umbrella policies."  Number

8    216:  Utica has communicated to Burnham's Utica's

9    projected reinsurance recoveries on losses and cost

10   allocated to the umbrella policies and other policies as

11   well.  217 reads:  "Utica and Burnham have had one or

12   more communications as with respect to the scope of

13   reinsurance that may be available to Utica to cover

14   Utica's loss and expense payments to Burnham in

15   connection with the Burnham claims."

16           Utica objects that these requests are vague

17   and ambiguous, not relevant and overly broad because

18   they do not specify a timeframe.

19           Utica also tries to refer R&Q to documents

20   regarding Utica's communications with Burnham rather

21   than characterizing those communications in the

22   responses.

23           Based on the authority previously cited,

24   Utica's effort to avoid responding to the request by

25   directing R&Q to documents are not proper under Rule 36.

1    A request that requires Utica to characterize

2    communications with Burnham are not objectionable per

3    se.   R&Q seeks these responses to support the position

4    that Utica may have colluded with Burnham to shift the

5    burden of Burnham's claims to Utica's reinsurers.

6              While admissions to these responses would not

7    necessarily be conclusive on that point, they are

8    sufficiently relevant under the liberal standards of

9    federal discovery which apply to Rule 36.

10             I do not think the phrasing of the requests

11   are vague or ambiguous but I won't rule out that Utica

12   might appropriately qualify an admission or denial to

13   clarify terms, as long as it does not try to evade the

14   specific focus of the requests.

15             Finally, as I suggested earlier, I understand

16   that the lack of a timeframe in the request could result

17   in an unqualified response -- could result in an

18   unqualified response suggesting unwarranted inferences.

19   So if, for example, Utica had no such communications

20   with Burnham until their recent settlement negotiation,

21   Utica could qualify its response with respect to

22   timeframes.   It may also be, as I suggested earlier,

23   that Utica could deny relevant knowledge or information

24   upon reasonable investigation regarding time periods in

25   the distant past.

1           Number 223 and 229 are overlapping requests

2    relating to what Utica communicated to Burnham with

3    respect to the lack of a stated products aggregate

4    limit.

5           Utica's response to 223 in its objections to

6    229 have the same problems as many of its prior

7    responses to requests regarding the products aggregate

8    limit issue and/or communications with Burnham.  Utica

9    is directed to make a more responsive denial or

10   admissions of these requests but, as just discussed, may

11   qualify its responses to deny information or knowledge

12   for different time period if necessary to avoid a

13   response that might suggest unwarranted inferences.

14          Request number 230.  In light of the phrasing

15   of the request that Utica and Burnham never agreed that

16   products aggregate limits would apply to each of the

17   primary policies, Utica's denial in those terms is

18   adequate.  Again, I can't, at this stage, rule on this

19   accuracy of Utica's denial.

20          Finally, with respect -- in this group request

21   number 252, I agree with Utica that the phrasing of this

22   request is vague and ambiguous and, in light of the

23   responses I'm requiring with respect to other requests

24   about communications with Burnham, I won't require a

25   further response.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

1          Request number 219, regarding metal powder or

2    metal power environmental claims.  Number 219 reads:  I

3    quoting here, "There are one or more written agreements

4    between Utica and Burnham as respect coverage for the

5    metal powder or metal power environmental claim."  Utica

6    objects to the request on various grounds, including

7    vagueness, ambiguity, relevance and because it

8    purportedly calls for a legal conclusion.

9          Did R&Q make a discovery demand for any

10   written agreements between Utica and Burnham with

11   respect to the resolution of this environmental claim?

12          MR. FINNEGAN:  Again, your Honor, I suspect

13   that at the outset of the case we asked for a broad or

14   formulated a broad request for all coverage agreements

15   and that during discovery or during discussions, we

16   would have narrowed it just to those that dealt with

17   asbestos, and the reason for asking this is obviously

18   the folks from Utica are going to be arguing the

19   following applies and what I would like to be able to

20   do, based on the documents that we have received in

21   discovery, it appears that there were at least two

22   different coverage-in-place agreements negotiated and

23   put in place with regard to and -- and the reason for

24   saying metal powder or metal power is that both words

25   are used in the documents.

1              It appears that there actually was a

2      coverage-in-place agreement put in place, and I'd like

3      to be able to distinguish the existence of the

4      coverage-in-place agreement for a certain environmental

5      claim with the absence of a coverage in place agreement

6      for asbestos.

7              THE COURT:  And did this claim arise

8      under some of the same primary or umbrella policies

9      involved in the asbestos claim in this case?

10             MR. FINNEGAN:  Yes.

11             THE COURT:  Bear with me for a second here.

12     R&Q asserts that the fact that Utica's resolution of a

13     coverage dispute with Burnham over this environmental

14     claim was documented in writing, would be relevant to

15     casting doubt on Utica's implied position that it

16     resolved coverage issues with Burnham regarding asbestos

17     claims under some of the same policies without any

18     written documentation.

19             So I think R&Q makes a viable case for the

20     relevance of this request.  The phrasing of request,

21     however, does not clearly address the relevant issue.

22     Utica arguably would be required to admit the request

23     just based on the fact that there was insurance policies

24     under which the environmental claim arose and it appears

25     R&Q, rather than seeking to confirm a fact indicated by

1   prior discovery, is trying to overcome a gap in the

2   discovery by using a request for admission in the first

3   instance.  So I'm not going to require Utica to make a

4   further request to this request.

5           The next group is requests regarding Utica's

6   concern about a coverage action with Burnham, requests

7   number 220 to 222.  Number 220 reads:  "Utica considered

8   but did not pursue coverage litigation against Burnham

9   to determine the parties' respective rights in

10  connection with the Burnham claims."  Utica made an

11  unqualified denial of 220.

12          R&Q questions how Utica could deny this

13  request based on the documentary and other discovery but

14  I am not supposed to evaluate the veracity of a denial

15  or admission at this stage.  I would note that when a

16  question like this focuses on the state of mind of an

17  entity, the entity would have some wiggle room in not

18  adopting the position that some of its employees or

19  agents may take.

20          Number 221 reads:  "Utica was concerned that

21  if it pursued coverage litigation against Burnham,

22  Burnham might assert that one or more of the primary

23  policies Burnham purchased from Utica lacked a stated

24  products aggregate limit."

25          Utica's response was that, quoting, "Utica

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    admitted that one or more of the Utica employees and/or

2    agents considered the possibility of potential coverage

3    litigation with Burnham, including the issues that

4    Burnham could seek to assert."

5          Utica's response in terms of its employees or

6    agents is not inappropriate when the state of mind of an

7    entity is being explored.  If, as R&Q suggests, there is

8    documentation that some of Utica's employees or agents

9    expressed the concerns reflected in the request, Utica

10   cannot evade a substantive response on that point.

11         Similarly, if there is documentation that some

12   of Utica's employees or agents considered whether, if

13   faced with a coverage action, Burnham might assert the

14   issue of whether certain primary policies lacked

15   explicitly stated dollar amounts for products aggregate

16   limits, Utica cannot evade a response on that issue by a

17   more general reference to issues Burnham could seek to

18   assert.

19         Request number 222.  "Utica sought to avoid a

20   broad coverage action with Burnham in which the

21   existence of products aggregate limits might become an

22   issue."  Utica's response:  "Utica admitted that,

23   everything else being equal, it prefers to avoid

24   litigation but denied it sought to avoid any appropriate

25   coverage action with Burnham."

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1           Again, because the focus of this question is

2       on the position of the entity, I don't think I can

3       address the accuracy of Utica's denial.  The revised

4       response to the prior request should address whether

5       employees or agents of Utica considered whether, if

6       faced with a coverage action, Burnham might assert the

7       issue of whether certain primary policies lacked

8       explicitly stated dollar amounts for products aggregate

9       limits.

10          Assuming Utica adequately responds to that

11      aspect of number 222, I won't require a further response

12      to 223.

13          However, if Utica doesn't address that issue

14      in response to 222 because of issues with the phrasing

15      in terms of concerns of Utica or its employees, I will

16      require a further response to 223.

17          If there is documentation that some of Utica's

18      employees or agents recommended avoiding a coverage

19      actions because Burnham might assert the issue of

20      whether certain primary policies lacked explicitly

21      stated dollar amount for products aggregate limit, a

22      qualified response in terms of its employees or agents

23      on that point would be required.

24          MS. ALCABES:  Your Honor, I might think you

25      might have misspoken on the numbering.  I think -- I

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1   think you're ruling that if we answer to 221, that our

2   answer to 222 could stand.

3            THE COURT:  Okay.  I think you are -- no, I

4   talked about 222.

5            MS. ALCABES:  Actually, talking about 223 and

6   I think you mentioned it.

7            THE COURT:  Okay.  Hang on a minute.  I'm

8   running out of gas, as you can perhaps tell here.

9            MS. ALCABES:  If I understood you correctly, I

10  think you were saying that 221 we should clarify our

11  answer.  And if we clarified our answer to 221, then 222

12  could stand.

13           THE COURT:  Yes.  No, I -- I think and I -- I

14  may have gotten lost in translation.  I did suggest the

15  qualified response to 221 would be required and then 222

16  is Utica sought to avoid a broad coverage action with

17  Burnham in which the existence of products aggregate

18  limits might become an issue and I said that the revised

19  response -- yes, to 221.  Yeah, okay.  The revised

20  response to number 221 should address whether employees

21  or agents of Utica -- yes.  So you're right.

22           So I'm saying basically if you adequately

23  responded to 221, you don't need a further response to

24  223.

25           MR. FINNEGAN:  222.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

1           MS. ALCABES:  222.

2           MR. FINNEGAN:  I think the parties are in

3   agreement, your Honor, that you meant to say 222.

4           THE COURT:  Okay.  Yes.  223 is not even in

5   this group.

6           MS. ALCABES:  Yes.

7           MR. FINNEGAN:  You're correct.

8           THE COURT:  All right.  I'm glad somebody

9   is checking my math here.  All right.  So you don't have

10  to respond to 222 if you cover that ground in 221.

11          MS. ALCABES:  Thank you.

12          THE COURT:  Thank you.  All right.  We are

13  getting close to the end here.  Thank goodness.

14          The next group requests for coverage opinions

15  regarding defense costs.  Requests 239, 240 and 242 to

16  246.  Requests 239 reads:  Following receipt of

17  Resolute's February 2008 inquiries about Utica's

18  obligation, if any, to pay defense costs under the

19  <u>Goulds</u>' umbrella policies, Utica for the first time

20  asked outside counsel to assess whether Utica had an

21  obligation to pay defense costs based on Section 2 of

22  the umbrella policy jacket from U/G-P-UL.

23          Utica objected to the request on various

24  grounds.  Utica's request with respect to relevance is

25  overruled.  When Utica sought outside coverage advice

1    about its position with respect to its obligation to pay

2    defense costs under the umbrella policies is relevant,

3    at least by federal discovery standards as to whether

4    that should be enforced under the "follow the fortunes"

5    analysis.

6            I take it there is discovery from the Goulds

7    cases that indicates that you Utica sought such

8    coverages advice from outside counsel in this timeframe?

9            MR. FINNEGAN:  There's both -- there is both

10   documentation and testimony from Kristen Martin.

11           THE COURT:  Okay.  So to extent that Utica

12   objects by referring R&Q to the documents for an answer,

13   that objection is overruled based on the authority such

14   as Booth Oil, and so Utica suggests there may be an

15   invocation of privilege, given their waiver of privilege

16   with respect to coverages issues, I'm not sure how

17   privilege issues would arise.  That one is directed to

18   you, Mr. Lee or Ms. Alcabes.

19           MS. ALCABES:  I'm going to let Mr. Lee answer

20   this.

21           MR. LEE:  Sorry, your Honor, give me one

22   second.  You know, I think for that one we objected to

23   the extent that it -- it sought it.  Sitting here right

24   now, I don't think that was the gist -- the driving

25   force behind that --

1            THE COURT:  Okay.

2            MR. LEE:  -- our objection here.

3            THE COURT:  All right.  And I understood what

4    you were trying to do with the false premise objection

5    previously but I don't see that how that applies here.

6            MS. ALCABES:  Your Honor, as I understand --

7    this is Elisa Alcabes again.  They're asking about a

8    timing issue and they're asking us to admit that prior

9    to this time, we didn't consult counsel.  I do think

10   it's a little bit of a confusing request.

11           THE COURT:  Okay.  Well, I'm going to direct

12   an admission or denial.  To the extent Utica reasonably

13   lacks knowledge or information about whether it

14   previously sought advice on this issue in the very

15   distant past, it may be able to qualify the response

16   with respect to the earlier period.  But, you know,

17   presumably, Mr. Turi or somebody is going to have a

18   pretty good handle on when they first sought coverage

19   opinions on this.  At least, you know, in the not way

20   distant past.

21           MS. ALCABES:  Okay.

22           THE COURT:  Number 240 asks Utica to admit the

23   language of a particular document which authorities such

24   as Booth Oil clearly approved.  If Utica still doesn't

25   know what document is being quoted, it can ask R&Q to

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    supply a copy before responding but I think a response

2    to that substantive response is required.

3         Utica's objections to number 242 are overruled

4    for reasons previously discussed in connection with the

5    same objection to similar questions.  Utica's shall

6    admit or deny whether it ever provided R&Q with a

7    coverage opinion on this specified language of the

8    umbrella policy jacket.  If Utica reasonably lacks

9    knowledge or information about whether it provided a

10   coverage opinion to R&Q in the very distant past, it may

11   be able to qualify the response with respect to earlier

12   time periods.

13        Number 243 completely overlaps number 239 and

14   242 so I will not require a further response to that.

15        Number 244 is vague and ambiguous particularly

16   with respect to when coverage advice was not, and I'm

17   quoting, "in connection with potential or actual

18   disputes."  So no further response will be required to

19   244.

20        Utica is directed to admit or deny number 245

21   and 246 with a few possible qualifications.  If Utica

22   cannot fairly respond in terms of whether it directed

23   the lawyers not to describe the research, it may make a

24   qualified response as long as it doesn't evade the focus

25   of the questions like it -- in the request that advice

1    as opposed to a directed the lawyers not to do the

2    research, you know, maybe one possibility.  Utica may

3    also appropriately respond in terms of what Utica's

4    employees or agents might have done if they had a viable

5    argument that these employees or agents did not

6    necessarily speak for the entity, but Utica's relevance

7    objection to these requests is overruled.

8            Number 251.  I think it's the last one I'm

9    going to address.  It reads:  "Utica cannot identify any

10   extraneous evidence, whether documentary or otherwise,

11   that reflects an intention by Utica to pay an insured's

12   defense costs following the exhaustion of an underlying

13   primary policy where Utica provided umbrella coverage

14   based upon the language contained in policy jacket form

15   U/G-P-UL."

16           Utica, I would note, denied 250, which made a

17   much clearer request that Utica could not identify any

18   document other than the umbrella policy jacket form that

19   reflected the intention reflected in number 251.

20           Number 251 seems to overlap with 250 except

21   that instead of using the term "document", it uses the

22   broader category of extraneous evidence, whatever that

23   may be.  So Utica's objection to the phrasing is sound

24   and I won't order a further response to number 251 in

25   light of Utica's response to 250.

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1          So that concludes my discussion of the request

2   for admission.  As I said earlier, it would take me a

3   week and a half to try to put this all down in a summary

4   order, so I'm going to require all of you to plow

5   through the transcript and, you know, you have been

6   remarkably attentive and part -- at least one time when

7   I misspoke, and so hopefully that will give you

8   sufficient guidance to resolve the ones that I ruled on

9   specifically.

10          As I stated earlier, if I didn't make a ruling

11  with respect to a specific request, primarily those

12  noted in footnote 2 of R&Q's belief, then no further

13  request of the brief is required.

14          I tried, as I said earlier, to be as specific

15  as possible in my rulings but Utica obviously still has

16  to revise some responses based on more general guidance

17  from me.  I expect Utica to fairly address the substance

18  of the request as stated where I directed that further

19  responses.  If Utica does not and I have to address the

20  revised responses, I will likely direct that admissions

21  rather than a further opportunities to amend its

22  responses.

23          I will also warn R&Q that any -- it needs to

24  accept that it cannot expect me to require Utica to

25  admit R&Q's expand on every issue that it has raised.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    So if I'm required to deal with another motion with

2    respect to these requests for admissions, the parties

3    can expect that I will sanction anyone who has, in my

4    view, acted unreasonably in applying the guidance that I

5    provided today.

6            So not long ago, I believe Mr. Finnegan filed

7    a letter about the need to expand the timeframe for

8    discovery in light of all the recent developments,

9    including the supplemental production of more than

10   100,000 pages of documents.  I think that is, at least

11   in general terms, is not an unreasonable request.

12           So I guess my question for the parties is

13   whether we want to get specific about how much time we

14   need to extend the schedule or how much discussion we

15   need to have about the scope of appropriate further

16   discovery or whether it makes sense to have the parties

17   have a little time to digest, for example, the

18   additional discovery that's been provided recently and

19   then confer and see if you can propose a revised

20   schedule.

21           MR. FINNEGAN:  Just so the Court is aware, the

22   parties did have a discussion on Friday where we

23   exchanged thoughts about deadlines.  We -- you know,

24   they weren't wildly different but there were differences

25   and we both concluded at the end of that conversation

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1    that it would be best for us to get your rulings today,

2    then confer again and hopefully within a few days

3    provide the Court with an agreed set of deadlines.

4            So if -- if the Court is amenable, I would ask

5    that we have -- end of this week or early next week to

6    report back on revised schedule for a completing fact

7    discovery, exchanging rebuttal expert reports, and

8    completing expert discovery and filing dispositive

9    motions.

10           MS. ALCABES:  Your Honor, Elisa Alcabes.  Yes,

11   we -- we agree with that approach.  I think that, given

12   the Court's guidance today, which has been very helpful,

13   I do think that we will be able to come to an agreement

14   hopefully on the date.

15           THE COURT:  Okay.  So a week, maybe May 8th?

16   Does that give you enough time or do you need a little

17   more?

18           MR. FINNEGAN:  I would give us to May 8th and

19   if we -- we can't get it done, we will report back to

20   you but, in my experience, we lawyers function better

21   when they have got real deadlines on their plate.

22           THE COURT:  Okay.  Is there anything else we

23   need to discuss this afternoon?

24           MS. ALCABES:  No, your Honor.

25           MR. LEE:  Not from our end.


                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

UTICA MUTUAL v R&Q INSURANCE - 15-cv-270

1       THE COURT:  All right.  I appreciate your

2   patience as I've droned through all of this.  I hope it

3   gives you enough guidance that I won't have to revisit

4   it.

5       MS. ALCABES:  Thank you.

6       MR. FINNEGAN:  Thank you for your diligent

7   review of all the papers, your Honor.

8       THE COURT:  Good afternoon, Counsel.

9       MR. FINNEGAN:  Bye.

10       (Proceeding concluded)

11           * * * * * * * * * *

12

13           C E R T I F I C A T I O N

14

15

16       I, Lisa L. Tennyson, RMR, CSR, CRR, Official

17   Court Reporter in and for the United States District

18   Court for the Northern District of New York, hereby

19   certify that the foregoing pages taken by me to be a

20   true and complete computer-aided transcript to the best

21   of my ability.

22

23   _____ _Lisa L. Tennyson_ _____

24           Lisa L. Tennyson, R.M.R., C.S.R., C.R.R.

25


           Lisa L. Tennyson, CSR, RMR, FCRR
           UNITED STATES DISTRICT COURT - NDNY